**MARIE SALDANA, Plaintiff**
**v.**
**KMART CORPORATION, Defendant**

Civ. No. 1995-90M

District Court of the Virgin Islands

Division of St. Croix

December 20, 1999

LEE J. ROHN, ESQ., *Law Offices of Lee J. Rohn*, St. Croix, VI, *for plaintiff*

ANDREW C. SIMPSON, ESQ., *Bryant, White & Barnes, P.C.*, St. Croix, VI, *for defendant*

Moore, *District Judge*

## MEMORANDUM

The defendant, Kmart Corporation ["Kmart" or "defendant"], has moved to exclude the opinion of plaintiff's expert witness, Rosie Mackay ["Mackay"], and filed a motion for summary judgment. The plaintiff, Marie Saldana ["Saldana" or "plaintiff"], has opposed both motions. For the reasons set forth below, the Court will grant Kmart's motions both to exclude the testimony of Rosie Mackay and for summary judgment.[1] The Court also rules on Kmart's motion for sanctions against plaintiff's counsel.

## I. FACTS

On or about April 20, 1995, Saldana was shopping at Kmart's store located in St. Croix, U.S. Virgin Islands. As she walked down an aisle, she slipped and fell in a puddle of what was later identified as Finish 2001 car wax. It is undisputed that no one saw the wax on the floor before the accident, nor is there any evidence of the size of the puddle before plaintiff fell. Neither Saldana, nor her mother or aunt, who were with her when she fell, saw the spill. Moreover, neither Saldana's mother and aunt, not an unknown couple that was also in the aisle at the time and remain unidentified, slipped in the wax. Other than the opinion testimony which

---

[1] Kmart also has filed a motion to exclude the testimony of plaintiff's witness Chester Copemann and the plaintiff has filed a motion in limine concerning the "introduction of evidence of EFA test." The Court does not reach the merits of these motions because it will grant summary judgment in favor of Kmart.

359

Kmart has moved to exclude, there is no evidence of how long the wax had been on the floor, although plaintiff did notice a light brown dust on the puddle after her fall. There were no tracks of wax near the puddle from anyone else stepping in it before Saldana. The only evidence of the size of the wax spill at any time is plaintiff's estimate, after her fall had disturbed and smeared the wax, that it was about twenty-four inches across.

## II. DISCUSSION

### A. Kmart's Motion for Summary Judgment

■ To establish liability, Saldana must prove that the wax was on the floor and that Kmart had notice of this particular condition and that this condition involved an unreasonable risk of harm to a business invitee such as herself. There is no evidence that Kmart had actual notice of the spill. Thus, Saldana must establish that the wax was "on the floor long enough to give [Kmart] constructive notice of this potential 'unreasonable risk of harm.'" *See David v. Pueblo Supermkt.*, 740 F.2d 230, 233-34 (3d Cir. 1984) (quoting RESTATEMENT (SECOND) OF TORTS § 343 (1965)). Even though the fact that the wax was on the floor at the time of the fall is uncontested, "the mere presence of the foreign substance does not establish whether it had been there a few seconds, a few minutes, a few hours or even a few days before the accident." *Id.* How long a slippery substance must remain on the floor for it to constitute constructive notice is to be determined on a case-by-case basis. *Id.* at 236 (The plaintiff must produce reliable evidence that the condition existed sufficiently long for it to become "a question of fact for the jury whether, under all the circumstances, the defective condition of the floor in the store existed long enough so that it would have been discovered with the exercise of reasonable care.").

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 91 L. Ed. 2d 202,

106 S. Ct. 2505 (1986). The moving party may seek a summary judgment with or without supporting affidavits. *See* FED. R. CIV. P. 56(b). Neither the moving nor the opposing party may either support or oppose a motion for summary judgment with evidence that would be inadmissible at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 n.19, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970).

Although the Court must draw all reasonable inferences from the evidence in favor of the non-movant, *see Anderson*, 477 U.S. at 256, the party opposing summary judgment "may not rest upon the mere allegations or denials of the pleading;" its response, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968). Indeed, the non-moving party must come forward with evidence from which a reasonable jury could return a verdict in her favor. *See Anderson*, 477 U.S. at 248; *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

In support of its motion for summary judgment, Kmart points to the deposition testimony of Eugenie Williams, a Kmart "Loss Control Associate," whose responsibilities included patrolling the store looking for any hazardous situation. (Williams Dep. at 17.) Williams walked through the aisle where Saldana fell *three minutes* before the accident and did not see any Finish 2001 product on the floor. (*Id.* at 15, 43.) Williams was certain that she would have seen the wax if it had been on the floor when she walked through that same aisle. (*Id.* at 43.)

Saldana has offered no evidence that Kmart had actual notice of the spill. Instead, she attempts to show that Kmart had constructive notice through her own testimony that she noticed a layer of dust on the puddle of car wax after she had fallen, and through the expert testimony of Rosie Mackay, proffered as a safety engineer. Since Mackay's opinion testimony is the only evidence which bears on the length of time the wax was on the floor, the Court will first rule on Kmart's motion to exclude her testimony. The Court will

then determine whether plaintiff's case can survive defendant's motion for summary judgment without circumstantial evidence that the wax "was left on the floor for an inordinate period of time" sufficient to constitute negligence. Put another way, is the evidence sufficient to raise a question of fact for the jury, namely, "whether, under all the circumstances, the defective condition of the floor in the store existed long enough so that it would have been discovered with the exercise of reasonable care." *David*, 740 F.2d at 236.

## 1. Standards for District Court's Gatekeeping Function

Kmart has moved to exclude Mackay's opinion and testing as unreliable and lacking any scientific or other replicable and reliable procedures. One of the functions of a trial judge is to rule on preliminary questions of admissibility and relevancy. *See* FED. R. EVID. 104(a); 402. Expert testimony is addressed by Rule 702 of the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

With respect to the expert matters described therein, Rule 702 "'establishes a standard of evidentiary reliability.'" *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)).[2]

The district court acts as "gatekeeper" to enforce these standards of evidentiary reliability by assuring that the technique, procedure, and methodology upon which an expert's opinion is founded are reliable in the scientific, technical, or other specialized field in which the witness professes expertise. Even before the Supreme Court's ruling in *Kumho Tire*, this Court in 1998 extended *Daubert's*

---

[2] *See, e.g., Daubert*, 509 U.S. at 589 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); *In re Paoli R.R. Yard PCB Litig.* ["*Paoli II*"], 35 F.3d 717, 732 (3d Cir. 1994) (The expert's testimony must be helpful to the trier of fact and must be based on a methodology which "is reliable, i.e., . . . the expert's conclusion [must be] based on good grounds.").

scientific analysis to expert testimony based on "technical" or "other specialized knowledge" gained by "skill, experience, training, or education" covered by Rule 702. *See Belofsky v. General Elec. Co.*, 37 V.I. 334, 980 F. Supp. 818, 821-23 (D.V.I. 1998) (*Daubert* principles applied to testimony of engineer with expertise in mechanical engineering and product safety design).

■ In addition to requiring the witness to be qualified as an expert in her field, Rule 702 mandates

> "a valid . . . connection to the pertinent inquiry as a precondition to admissibility." And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline."

*See Kumho Tire*, 119 S. Ct. at 1175 (quoting *Daubert*, 509 U.S. at 592)(citations omitted). To summarize, Rule 702 has three major requirements: (1) the witness must be an expert; (2) the procedures and methods used must be reliable; and (3) the testimony must "fit" the factual dispute at issue so that it will assist the jury. *See, e.g., Kumho Tire*, 119 S. Ct. at 1175; *Daubert*, 509 U.S. at 590-93; *Paoli II*, 35 F.3d at 741-43; *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985). Even if the evidence offered by the expert witness satisfies Rule 702 and is relevant under Rule 402, it may still be excluded under Rule 403 if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." FED. R. EVID. 403.

## 2. Application of Daubert/Kumho Standards to Mackay's Opinion Evidence

For the purpose of ruling on Kmart's motion, the Court will assume that Mackay satisfies the first requirement of *Daubert/Kumho*, namely, that she possesses the necessary "knowledge, skill, experience, training, or education" to be qualified to give expert testimony as a safety engineer.

Plaintiff has submitted two expert reports from Mackay: an initial report dated January 1997, (*see* "Expert Opinion" (Jan. 9,

363

1997) (attached as Ex. A to Mot. in Limine to Exclude the Opinion of Rosie Mackay) ["January Report"]), and a supplemental report dated April 15, 1997, (*see* "Supplement to Expert Opinion" (Apr. 15, 1997) (attached as Ex. 2 to Pl.'s Reply Regarding Mot. to Strike) ["April Report"]). For the reasons stated below, virtually all of the January Report will be excluded, as will the opinion in the April Report "that K-Mart failed to properly inspect and maintain the floors, allowing the Finish 2001 Car Polish to remain on the floor, causing Ms. Saldana to fall."

The Court will exclude the entire "Conclusion" portion of Mackay's January Report because it would impose on defendant the erroneous legal standard of strict liability, namely, that "K-Mart was negligent in that there was a spill, and it was not cleaned up. Ms. Saldana was the unfortunate victim of this act of poor housekeeping . . . ."[3] Mackay concluded that

K-Mart failed to:
1. provide an establishment free from recognized hazards
2. keep floors in a dry condition
3. warn of an impending danger
4. utilize its written policy of searching and correcting, on a regular basis, the conditions that produce dirt, foreign substances and disorder.

(January Report at 4.) The only factual basis in the record for Mackay's conclusion in her January Report that "K-Mart allowed liquid product, in this case, a car wax finish that would cause water to bead, indicating a high slipperiness, to accumulate on the floor for some time" was that "Ms. Saldana was able to notice a dust

---

[3] The expert's task is to use her knowledge and expertise to assist the trier of fact in understanding evidence or in making a disputed factual determination. Legal conclusions from an expert, however, neither provide insight into the evidence nor clarify disputed facts. Besides not helping the jury, legal opinions from an expert encroach on the court's sole responsibility as arbiter of the law. Although the Court of Appeals for the Third Circuit has not addressed this evidentiary question, several other Courts of *Appeals* have held that an expert cannot render legal opinions. *See, e.g., Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (relying on *Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir. 1986)); *United States v. Zipkin*, 729 F.2d 384 (6th Cir. 1984); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236 (5th Cir. 1983); and *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977).

film on it." As discussed more fully below, this is insufficient evidence from which a reasonable jury could find Kmart negligent.

■■■ To reach her spurious conclusion, Mackay relied in part on the federal regulations of the Occupational Safety and Health Act, 29 U.S.C. §§ 651-78 ["OSHA"], and the Virgin Islands Occupational Safety and Health Act, 24 V.I.C. §§ 31-51 ["VI OSHA"]. (*See* January Report at 1.). OSHA and its Virgin Islands counterpart protect only employees. *See* 29 U.S.C. § 651(b)(b) (The purpose of OSHA is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions."); 24 V.I.C. § 33 ("This chapter shall apply with respect to employment performed in a workplace within the Virgin Islands."); *see also Encarnacion v. Kmart Corp.*, Civ. No. 1997-063, Order (D.V.I. St. Croix Div. May 3, 1999). Since Saldana obviously was not an employee of Kmart at the time of the accident, neither OSHA nor VI OSHA would assist the jury in determining whether Kmart was negligent.[4] Accordingly, all references to either OSHA or VI OSHA would be inadmissible at trial.

Although the opinion portion of Mackay's April Report must be excluded, the Report does contain some information which might be of assistance to the jury, namely, the results of her "pour testing" of two bottles of Finish 2001 Car Polish she bought from Kmart:

Bottle #1 was hand-held at a pouring angle, poured into a container, and timed. The substance was somewhat thick and lumpy. The time for the entire bottle to be emptied was 2:45 (two minutes and forty five seconds).

Bottle #2 was shaken, hand-held at a pouring angle, poured onto a vinyl tile surface particularly similar to the one at K-Mart, and timed. Because of the shaking, the substance in bottle #2 was smoother, poured more

---

[4]Plaintiff would be permitted to introduce relevant portions of Kmart's own safety and environmental health manual. Plaintiff will not, however, through Mackay or otherwise, be permitted to introduce statistics of employee and customer slips and falls for the first nine months of 1988, or any other year. Such statistics are totally irrelevant in that they have no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* FED. R. EVID. 401. The probative value of these statistics, then, is clearly and overwhelmingly "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *See* FED. R. EVID. 403.

quickly. The time for the entire bottle to be emptied was 2:00 (two minutes).

The contents of Bottle #2 was left on the floor for a total of five minutes, and the puddle was observed and measured. The puddle took an oval shape, the longest dimension measured was 12 inches.

(April Report at 3.)[5]

While not clear in her April Report, it turns out from her deposition that the "vinyl tile surface particularly similar to the one at K-Mart" was her vinyl tile floor at home, which was more than seventeen years old.[6] In deciding whether Mackay's opinion testimony should be excluded because the test results on which it is based "were not conducted under any type of scientific setting, with the appropriate variable controlled," (see Reply to Pl.'s Opp'n to Mot. for Summ. J. at 5), it is important to separate the tests and their results from Mackay's unscientific and unverifiable extrapolation of those results. While the two test pours described in

---

[5] Defendant has presented no basis for the Court to exclude Mackay's slip-resistance test on the Kmart floor to measure the static coefficient of friction described in her April Report, and it would not be excluded.

[6] The following is from Mackay's deposition:

Q Did you pour it on the same tiles that she slipped on?
A I didn't pour it in Kmart, but I have vinyl tiles at home in my kitchen; so I poured it on that.
Q How old are the vinyl tiles in your kitchen?
A I don't know. I've been in the house for seventeen years. So I'm not sure when they were put in, but they were put in before that.
Q Do you know what you use ordinarily to wax those or to clean those floors?
A I use one of the store bought things.
Q Do you know which one?
A I don't remember. I just sort of buy.
Q Do you know how long the Kmart tiles had been there?
A I think they were refurbished after Hurricane Marilyn.
Q In '95?
A Yeah, I think so. Mine are not as highly polished as the ones in Kmart, which would make me think that because theirs are more highly polished, it would flow more quickly than it would on mine at home. Which means in Kmart I would get a bigger puddle than I would on mine at home.
Q Do you have any idea what Kmart uses to clean or polish their floors?
A It may be in the — I think I have something from R & R but I am not sure.
Q Did you try to use whatever they use to clean your floors before?
A No.

(Deposition of Rosie Mackay, June 13, 1997, at 19-20) ["Mackay Dep."].)

Mackay's April Report required little if any expertise to perform, they do appear to be reliable and replicable. They also demonstrate two versions of the time period it might have taken for the wax to get from the bottle to the Kmart floor, specifically, from two minutes to two minutes and forty-five seconds. Mackay's measuring of the size of bottle #2's puddle also seems replicable and not unreliable.[7]

Mackay runs into difficulty, however, when she attempts to extrapolate from these tests on her kitchen floor to opine that the wax had to have been on the Kmart floor for at least eight minutes to create a puddle about twenty-four inches square. (*See* Mackay Dep. at 16 ("It was like two [12 x 12 inch] tiles by two tiles."); 19 ("[F]or it to get that big, it would have had to have sat there better than eight minutes."); 47 ("It takes like eight minutes to get a nice size puddle.").) Unfortunately, there is no evidence that the puddle was two tiles or twenty-four inches across until **after** Saldana spread it around during her fall and recovery from that fall. Plaintiff has presented no evidence of the size of the wax spill just before or as she stepped in it. Hence, even if Mackay had given some scientific or technical analysis or explanation for her opinion on the length of time the spill was on the floor, it addressed a false and nonexistent premise about the size of the wax spill.[8]

■ The Court finds that Mackay's opinion "that K-Mart failed to properly inspect and maintain the floors, allowing the Finish 2001 Car Polish to remain on the floor, causing Ms. Saldana to fall" constitutes rank speculation without any scientific or technical basis. Moreover, this so-called expert testimony would be of no assistance to the jury because it does not fit the facts of this case. Since the jury would have no evidence of the size of the spill the moment before plaintiff stepped in it, Mackay's test and specula-

---

[7] The parties, and therefore the Court will also, appear to assume that Mackay timed the five minutes from the start of the second pour and not from its completion.

[8] Kmart complains that Mackay's pour tests only show how the wax spread on her kitchen floor and thus has no bearing on how fast and how far the car wax would spread on Kmart's floors. (*See* Reply to Pl.'s Opp'n to Mot. for Summ. J. at 5.) The Court agrees with plaintiff that questions such as the age and condition of Mackay's tiles as compared to Kmart's floor tiles and how long she shook bottle #2 are the kinds of questions which could be tested by cross-examination of the expert at trial. They do not in themselves make Mackay's testimony unreliable or inadmissible.

tion concerning how long it would take for the wax to form a puddle of any size is not probative on the issue of constructive notice to Kmart and would tend to confuse and mislead the jury. It therefore will be excluded as irrelevant under Rule 402, as confusing or misleading under Rule 403, and as technically (scientifically) unreliable under Rule 702 and *Daubert/Kumho*.[9] This leaves the claim that a layer of dust had accumulated on the puddle as Saldana's *only* evidence supporting a finding that Kmart had notice of the spill because "the floor condition had existed for such a length of time that [Kmart], in the exercise of ordinary care, should have been aware of the condition." *David*, 740 F.2d at 236.

■ Saldana claims that after she fell, she noticed a light brown dust on the puddle of car wax. (Saldana Dep. at 10 (attached as Ex. 1 to Pl.'s Opp'n to Def.'s Mot. for Summ. J.).) By Saldana's own testimony, hers were the only footprints in or near the puddle. (*Id.*) Saldana has offered no evidence of how much dust was there, how long it would have taken for any amount of dust to accumulate, or, indeed, whether it was dust from the air or dust already on the floor. In essence, Saldana has tendered no evidence by which a trier of fact could "'reasonably and legitimately infer[] in what period of time'" the car wax spilled on Kmart's floor or how long the puddle was on the floor before Saldana's fall. *See Rumsey v. Great Atl. & Pac. Tea Co.*, 408 F.2d 89, 90 (3d Cir. 1969)(quoting *Lanni v. Pennsylvania R.R.*, 371 Pa. 106, 88 A.2d 887, 889 (Pa. 1952)).[10]

---

[9] The Court also will exclude any testimony from Mackay about additional pour tests she conducted after the deadline for producing expert reports and after Kmart had served plaintiff with its motion for summary judgment. (*See, e.g.*, Mackay Dep. at 16-17.)

The Court will deny plaintiff's motion to strike the portions of Kmart's Reply to Plaintiff's Opposition to Motion for Summary Judgment which attack the testing conducted by Mackay in June, 1997. (*See* Motion to Strike New Issues Raised in Def.'s Reply Mem.) Saldana contends that Kmart should not be allowed to raise the issue by way of reply. Although she did some testing before Kmart served its motion for summary judgment, Mackay ran two more tests well after the deadline for submitting expert reports. Saldana then attempted to rely on the new tests in her opposition to summary judgment. Defendant was entitled to respond to the new material in its reply.

[10] *See also Flocco v. Super Fresh Mkts., Inc.*, 1998 U.S. Dist. LEXIS 20266, 1998 WL 961971 (E.D. Pa. Dec. 29, 1998). Plaintiff slipped and fell in a supermarket on the still wet contents of a broken jar of turkey gravy which she did not notice before she slipped. The only circumstantial evidence of notice was that no one was in the aisle just before she fell and no one in the store at the time heard the jar break, implying that the jar had been broken for the entire thirty minutes which the plaintiff had been in the store. The court held

Accordingly, the Court, after construing the facts in the light most favorable to the plaintiff, finds that there is no genuine issue of material fact. The Court will grant Kmart's motion for summary judgment.

## 3. Motion for Sanctions to Be Imposed on Attorney Rohn

Kmart also has moved for sanctions against plaintiff's attorney, Lee J. Rohn ["Rohn"], based on her habit of using the word "fuck" ["f**k"]. Kmart has provided the Court with a laundry list of instances in which Attorney Rohn routinely expressed her displeasure or disagreement by bringing this profanity into judicial proceedings. After the parties fully briefed the issue, the Court limited the review to Rohn's conduct in District Court cases.[11] Kmart and counsel for Rohn were given the opportunity to present witnesses and other evidence and to argue their respective points of view. After reviewing the papers, arguments, and evidence, the Court will grant defendant's motion and impose sanctions on Attorney Lee J. Rohn.

A recitation of the instances of counsel's misconduct will demonstrate the necessity for sanctions and underscore the incivility of Rohn's behavior.[12]

---

that plaintiff "failed to produce competent evidence from which one, without speculation or conjecture, could reasonably find that defendant had actual or constructive notice of the condition in question." *Id.* at *3. Saldana's claim that she saw dust on the puddle of wax *after* her fall is no more probative of the issue of notice than the plaintiff's argument in *Flocco* that no one in the store at the time of the plaintiff's fall had heard the jar break.

The court in *Flocco* also rejected plaintiff's suggestion that the store manager's routine inspection of each aisle every fifteen to thirty minutes was inadequate. The court could find "no basis of record to sustain a finding that this practice was unreasonable," or that the store had failed in its obligation to "exercise reasonable care to discover and correct or warn invitees of any dangerous condition." *Id.* Similarly, this Court finds no basis to conclude that the even more frequent inspections by Kmart's loss control associate was unreasonable or indicative of negligence on Kmart's part. Ms. Eugenie Williams was the loss control associate whose job it was to patrol the store looking for any hazardous situation and did not seen any Finnish 2001 product on the floor when she walked through the aisle just *three minutes* before Saldana fell. (Williams Dep. at 15, 17, 43.)

[11] Kmart included examples of Attorney Rohn's behavior from several Territorial Court cases. It seems that the Territorial Court would be the appropriate forum in which to address these instances.

[12] The Court notes that this list is limited to those instances raised by Kmart's counsel in its motion.

a. During the course of the telephone deposition of a witness, the following exchange took place between Rohn, Attorney Beth Moss, a Virgin Islands attorney, and Attorney Todd Newman, another Virgin Islands attorney who participated by telephone:

> Rohn: While we're waiting, let's identify who we represent.
>
> I'm Lee Rohn, I represent the Plaintiff.
>
> Moss: Beth Moss for the Defendants.
>
> Rohn: Who do you represent, Todd?
>
> (Respite)
>
> Rohn: Todd, *I don't want to fuck around.*
>
> Newman: I'm corporate counsel for UDCI, and I'm just really here to try to help set this thing up.

(*See* Dep. of Richard Magee at 4 (May 29, 1996)(emphasis added), in *Germain v. United Dominion Constructors, Inc.*, Civ. No. 1993-028 (D.V.I. St. Croix Div.), attached as Ex. D to Kmart's Mot. for Sanctions.)

b. In a deposition conducted a few months later, the following dialogue took place between Attorney Rohn and Attorney Neal L. Schonhaut:

> Q (Schonhaut): Is it fair to say that during the 23 years of doing undercover surveillance you have continuously made efforts to conceal your efforts at a subject's —
>
> Rohn: Objection. Leading question.
>
> Schonhaut: Not one of those has been leading.
>
> Rohn: It has.
>
> Schonhaut: You are just cluttering up the record.
>
> Rohn: I will put my remarks on the record as I'm entitled. I don't need to be lectured by you, sir. *Don't fuck with me.*
>
> Schonhaut: Just listen.
>
> Rohn: I can make every objection —
>
> Schonhaut: It's a formal objection. I would like an opportunity to clear it up.
>
> Rohn: You are not the judge in this case. I don't think you make that determination, although you always act

370

like you do. I will make all the objections that I
want.

Schonhaut: I will clear up form questions, but you are
making improper objections.

Rohn: I don't care what you do. We can continue this or
not.

(*See* Dep. of Steven K. Brown at 44 (Oct. 11, 1996) (emphasis added), in *Williams v. Rene*, 32 V.I. 216, 886 F. Supp. 1214 (D.V.I. St. Croix. Div.), attached as Ex. E to Kmart's Mot. for Sanctions.)

Attorney Rohn has exhibited similar conduct in her dealings with other members of the bar:

c. During a telephone conversation, Rohn screamed at Attorney Beth Moss to "just get me the fucking phone numbers" for an upcoming deposition.[13] (*See* Affidavit of Beth Moss regarding *Rennie/Charles v. Hess Oil Virgin Islands Corp.*, Civ. Nos. 1995-066, 1998-001 (D.V.I. St. Croix Div.), attached as Ex. F to Kmart's Mot. for Sanctions.)

d. During a conversation with Attorney Andrew Simpson arising in this case, Rohn told Simpson "you know Andy, go fuck yourself." (*See* Affidavit of Andrew C. Simpson regarding *Saldana v. Kmart Corp.*, 1999 U.S. Dist. LEXIS 21088, Civ. No. 1995-090, attached as Ex. G to Kmart's Mot. for Sanctions.)

e. After a jury verdict returned in favor of her client, Attorney Rohn sent a letter to a defense expert witness stating the following:

> Since you threw down the gauntlet, I thought you would be interested in knowing what the jury decided. The jury awarded Ms. Bell $475,000. They discounted your testimony completely and felt you were pompous and arrogant. I did concur with one of the jurors who referred to you as a Nazi.

---

[13] Attorney Moss advised Rohn by letter that she would not tolerate being spoken to in such a manner, and concluded with the suggestion that if Rohn wanted "the exact locations of the Texas deponents' residences, I suggest you consult a map." (*See* Letter from Attorney Moss to Attorney Rohn at 1 (Feb. 4, 1997) (attached as Ex. F of Kmart's Mot. for Sanctions.) While the Court does not condone Attorney Moss' sarcasm, it is exactly the type of unhelpful and unaccommodating response Attorney Rohn's incivility can be expected to elicit.

(*See* Letter from Attorney Rohn to Dr. Thomas M. Hyde, MD., Ph.D (Mar. 16, 1995), in *Bell v. Bricker*, Civ. No. 1990-069 (D.V.I. St. Croix Div.), attached as Ex. I to Kmart's Mot. for Sanctions.)

Finally, Kmart brought to the Court's attention two orders admonishing Attorney Rohn and/or her law firm for improper behavior.

f. Another judge of this Court admonished Attorney Rohn for calling opposing counsel "Esso's latest pawn" in a letter to the Court. (*See* Order of Dec. 13, 1995, *Williams v. Rene*, Civ. No. 1991-231 (D.V.I. St. Croix Div.) ("The Court will not tolerate personal attacks on counsel. Such lack of professionalism demeans the Court as well as counsel before it."), attached as Ex. A to Kmart's Mot. for Sanctions.)

g. The magistrate judge admonished Attorney Rohn's law firm to "refrain from personal attacks on other counsel and judges." (*See* Order of May 31, 1996, at 10-11, *Saldana v. Banco Popular de Puerto Rico*, Civ. No. 1996-001 (D.V.I. St. Croix Div.), attached as Ex. B to Kmart's Mot. for Sanctions.)[14]

To Attorney Rohn, litigation is a form of mortal combat which she must win at any and all costs, rather than the structured and

---

[14]The magistrate judge admonished the firm of Rohn and Cusick for Attorney Maurice Cusick's statements in a pleading he filed in *Saldana v. Banco Popular* which attacked an opinion of Territorial Court Judge Alphonso Andrews, Jr., in *Peter v. Hovic*, Civ. No. 1994-040 (Terr. Ct. St. Croix Div. Mar. 21, 1996). Attorney Rohn's Opposition to Kmart's Motion for Sanctions repeats, adopts, and even attempts to argue the very assertions regarding *Peter v. Hovic* that resulted in her firm being admonished in *Saldana v. Banco Popular*. Although Rohn offered a different interpretation at the hearing on Kmart's motion for sanctions in this matter, to the effect that her intention had been to merely to point out the reasonableness of the assertions, she is contradicted by her own words in that opposition:

The Court also relies upon the *Paul Peter vs. Hovic* decision, of which this current Court is aware since it was the subject of a recent appeal and oral argument. Since defendant decides to raise these decisions as authority, let us take a moment and discuss them. In [Kmart's] Exhibit "B" [to motion for sanctions], the Court criticizes Attorney Cusick's view that "although the [*Peter Paul*] motion was pending for 18 months, Judge Andrews apparently did not even take the time to read it." *Id*. This is because the decision, which made the crucial decision of disqualifying counsel (again, merely on tactical grounds as no legitimate reason was ever stated) contained *numerous* and *plain* errors, which *even Attorney Simpson agreed existed*. Yes, in that case "little attention" was paid. To criticize counsel for pointing this out, which all know to be true, does not further the interests of the legal system — it hampers them. It was not a personal attack on the Judge, it was the facts — the truth.

professional mechanism civilized society has established for peaceably resolving legitimate disputes. One of the obvious effects of such incivility and this "scorched-earth" approach to litigation is to discourage cooperation between lawyers. *See Thomason v. Lehrer*, 182 F.R.D. 121, 122 (D.N.J. 1998). Chief Justice Warren E. Burger went so far as to characterize lawyers who could not behave as "a menace and a liability, not an asset to the administration of justice."[15] Clearly, Rohn's conduct would constitute contempt of court if committed in the presence of a district or magistrate judge. That it occurred during depositions makes it no less disrespectful and contumacious.

In her capacity as a practicing member of the Bar of the District Court of the Virgin Islands, Attorney Rohn must abide by the Rules of Professional Conduct of the American Bar Association ["ABA"]. *See* LRCi 83.2(a)(1). If Attorney Rohn fails to follow these Rules, she is subject to disbarment, suspension from practice before this Court, reprimand, or subject to such other disciplinary action as the circumstances may warrant. *See* LRCi 83.2(b)(4)(A).[16]

The ABA's Rules of Professional Conduct address the appropriate demeanor and decorum lawyers should possess. Attorney Rohn's conduct as described above fails miserably to comply with these ABA directives. Rohn's conduct ignores even the preamble to the ABA Rules which requires a lawyer to "demonstrate respect for the legal system and for those who serve it, including judges, other

---

(*See* Plaintiff's Opp'n for Mot. for Sanctions 8-9 n.8.) Attorney Rohn's continued failure to understand the problem with her method of attacking an unfavorable ruling emphasizes the need for her to receive training in civility.

[15] Chief Justice Burger made these remarks almost thirty years ago in 1971 in an address to the American Law Institute:

> Someone must teach that good manners, disciplined behavior, and civility — by whatever name — are the lubricants that prevent lawsuits from turning into combat. More than that, civility is really the very glue that keeps an organized society from flying into pieces. . . . I submit that lawyers who know how to think but have not learned to behave are a menace and a liability, not an asset, to the administration of justice.

WARREN E. BURGER, DELIVERY OF JUSTICE 175 (1990) (*reprinted in In re Appl'n of McLaughlin* for *Admission to the Bar of New Jersey*, 144 N.J. 133, 675 A.2d 1101, 1112 n.9 (N.J. 1996)).

[16] The Court adopted these Rules of Disciplinary Enforcement in furtherance of its inherent power and responsibility to supervise the conduct of attorneys who are admitted to practice before it. *See* LRCi 83.2(b).

lawyers, and the public." MODEL RULES OF PROFESSIONAL CONDUCT ["RULES OF PROF'L CONDUCT"] Preamble ¶ 4. The Court finds that Attorney Rohn's conduct also violates Rule 8.4: "It is a professional misconduct for a lawyer to: . . . (d) engage in conduct that is prejudicial to the administration of justice."

Attorney Rohn's behavior affects the administration of justice in several ways. It demeans the entire judicial process, the Court, the Bar in general, other counsel in particular, and even Attorney Rohn herself. That she used this gutter language in formal, court sanctioned proceedings in front of members of the public who were testifying under oath as deposition witnesses is especially appalling.

A specific example of Attorney Rohn's name-calling requires special mention. Calling an expert witness a "Nazi" in writing is beyond the pale of civilized conduct, and would seem to be libelous per se. Whatever the provocation may have been, it could not justify the use of such an extremely offensive and historically repugnant term. That Attorney Rohn would take the time to compose such a letter after *winning* a trial is truly incomprehensible.

In recent years, the ABA and numerous state bars have addressed the growing problem of the lack of civility and professionalism among lawyers of which Attorney Rohn's conduct is a prime example. *See* ABA JOURNAL, WHAT IT TAKES TO BE A PROFESSIONAL 48-73 (Aug. 1998); *see also* AMERICAN BAR ASS'N, SECTION OF LITIG., GUIDELINES FOR CONDUCT (a model code of standards of civility) (available at http://www.abanet.org/litigation/litnews/practice/guidelines.html>). This Court agrees with Judge Louis H. Pollack, Senior Judge, U.S. District Court for the Eastern District of Pennsylvania, in his assessment that a lack of civility damages the very essence of the law: "The lawyer . . . who tramples on civility undercuts belief in the law. . . . To treat an adversary with advertent discourtesy — let alone with calumny or derision — is a form of incivility that rends the fabric of the law." *See* Hon. Louis H. Pollack, *Professional Attitude*, ABA J. 66-67 (Aug. 1998).

The Court rejects Attorney Rohn's attempts to defend her behavior by citing articles from magazines and the actions of her fellow members of the Virgin Islands bar to support the notion that

374

use of the word f\*\*k is becoming more prevalent and even accepted in today's society. Whether the use of profanity is becoming more common in general society, matters have not deteriorated to the point where such language from an attorney will be tolerated in any judicial proceeding, even if a judicial officer is not present. Such incivil and abusive conduct directed toward other lawyers or witnesses outside of court-sanctioned proceedings is similarly intolerable.

To her credit, Attorney Rohn acknowledged at the hearing that her conduct was not appropriate behavior for a member of the Bar and promised to work on removing the use of the word f\*\*k from her vocabulary. To her further credit, no one has submitted any subsequent instances of Attorney Rohn's use of profanity during depositions or communications with other counsel during the all too extended length of time the Court has had this motion under consideration. To some extent, then, the delay in the Court's decision has been to Attorney Rohn's benefit as the sanction that would have been imposed at the time of the hearing would have been more severe and has been tempered in light of Attorney Rohn's apparent success at cleaning up her vocabulary.

The Court is chagrined to act as "kindergarten cop" and referee a dispute between attorneys caused by one who either never learned or has forgotten the basic good manners others learned before first grade.[17] The task is also distasteful because Rohn is otherwise a very talented and successful trial attorney who has no need to engage in such behavior. The Court is mindful of the needless waste of time, energy, and resources caused by Attorney Rohn's conduct. To make sure that this unpleasant process will not be repeated, the Court will impose a nonmonetary sanction[18] on Attorney Rohn designed to "reacquaint [her] with the notion that an attorney can be both an aggressive and principled advocate for a client without allowing [her] temper to override [her] profes-

---

[17] *See generally* ROBERT FULGHUM, ALL I REALLY NEED TO KNOW I LEARNED IN KINDERGARTEN (1993); *see also* Golden Rule ("Do unto others as you would have others do unto you.").

[18] A nonmonetary sanction is permitted pursuant to Local Rule of Civil Procedure 83.2(b)(4) and has been utilized in similar situations involving violations of Federal Rule of Civil Procedure 11. *See Thomason*, 182 F.R.D. at 131-32; *see also Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir. 1987).

sional obligations, especially to the Court." *Thomason*, 182 F.R.D. at 132.

Accordingly, the Court will order Attorney Rohn to attend in person and satisfactorily complete a continuing legal education seminar on civility in the legal profession within twelve months of the date of this opinion. This seminar must be sponsored or offered by a law school accredited by the ABA or a reputable provider of continuing legal education. The Court also will direct Attorney Rohn to write letters of apology to all the lawyers, and deposition and trial witnesses she demeaned and insulted by her vulgarity and abusive conduct in the instances cited above. Attorney Rohn also must apologize to the court reporters present at these proceedings who had the unpleasant task of not only listening to Rohn's language, but of also transcribing her tirades. She also shall send a copy of the attached order to the ethics committee of each bar of which she is a member.

■ Finally, the defendant and/or its counsel have expended money and other resources to bring Attorney Rohn's conduct to the attention of the Court. The Court, therefor, will impose a monetary sanction against Attorney Rohn in the amount of the attorney's fees and costs of the defendant associated with pursuing this motion for sanctions. The Court will direct the defendant to file an appropriate affidavit of fees and costs, with which it will make the final determination of the amount of the monetary sanction. Attorney Rohn, of course, may file a response.

### IV. CONCLUSION

In summary, the Court finds the expert opinion of plaintiff's expert witness Rosie Mackay, as described herein, to be unreliable and irrelevant to the issues at bar, and would be confusing and misleading to a jury. The Court, performing its gatekeeping functions, will not admit Mackay's opinion. The Court, however, would allow those parts of Mackay's expert report detailing the pour testing she conducted in April.

Without Mackay's representations, Saldana cannot carry the burden required to defeat Kmart's motion for summary judgment. The plaintiff simply has not presented any reliable evidence that

would allow a trier of fact to reasonably find that Kmart had actual or constructive notice of the spill in its store. Without this evidence, the Court finds as a matter of law that Kmart cannot be held liable for Saldana's injuries and damages which may have resulted from her fall.

The Court also finds the conduct of Attorney Rohn, as evidenced in the course of litigation surrounding this matter and in numerous other cases before the District Court, to be sanctionable. Her repeated use of profanity in depositions and conversations with other counsel is intolerable. Her attack on an expert witness is similarly objectionable. So this will not happen again, the Court will impose both monetary and nonmonetary sanctions on Attorney Rohn.[19] An appropriate order is attached.

## ORDER

For the reasons set forth in the accompanying Memorandum of even date, it is hereby

ORDERED that Kmart's motion in limine to exclude the opinion of Rosie Mackay (docket # 182) is GRANTED IN PART AND DENIED IN PART;

---

[19] Kmart's motion and the hearing on the motion were filed and conducted before the Court of Appeals' ruling in *Prosser v. Prosser*, 186 F.3d 403 (3d Cir. 1999). Nevertheless, the Court's procedure is in compliance with *Prosser*. Although the Court has taken a considerable length of time to resolve the motion, sanctions are imposed simultaneously with the resolution of the case on summary judgment. As noted in the discussion, the Court is not aware of any new occurrences of Attorney Rohn's sanctionable conduct, alleviating the Court of Appeals' concern that a delay may result in the party continuing to misbehave "because they do not have the benefit of disciplinary guidance from the court." *Id.* at 406. The dicta of the *Prosser* opinion concerning particularized notice and other due process concerns also are satisfied. Attorney Rohn had adequate notice of the Court's consideration of sanctions, first through Kmart's motion seeking sanctions, to which she responded, and then at the hearing. Attorney Rohn was given and took advantage of the opportunity to be heard and was permitted to present witnesses, evidence, and argument on her own behalf. Rohn clearly was aware of the possible range of sanctions that the Court could impose. Her counsel argued in favor of an admonishment, while Attorney Rohn herself acknowledged the possibility of suspension or disbarment. (Hearing Tr. at 31, 36 (Oct. 28, 1997) ("[Counsel for Kmart] asked that my license to practice law be suspended for 6 months if not revoked . . . ."). Kmart relied heavily on Local Rule 83.2 in support of its motion for sanctions and noted that it is in fact a privilege to be admitted to practice law before this Court. Attorney Rohn therefore has no grounds to complain that she was not aware of either the basis upon which the Court has imposed sanctions or the form those sanctions have taken.

ORDERED that Saldana's motion to strike new issues raised in defendant's reply memorandum (docket #145) is DENIED;

ORDERED that Kmart's motion for summary judgment (docket #139) is GRANTED;

ORDERED that Kmart's motion for sanctions against Attorney Lee J. Rohn for her repeated use of the word "fuck" during judicial proceedings and her other uncivil conduct toward fellow attorneys and expert witnesses is GRANTED. Attorney Rohn shall attend in person and satisfactorily complete a seminar on civility in the legal profession within twelve months after the entry of this Order. This seminar must be sponsored or offered by a law school accredited by the American Bar Association or a reputable provider of continuing legal education. Once completed, Attorney Rohn shall file an affidavit with the Court so attesting. It is further

ORDERED that Attorney Rohn shall send letters of apology to all the lawyers she demeaned and insulted by her vulgarity and abusive conduct in the District Court cases referred to in the attached Memorandum. Attorney Rohn also shall apologize in writing to the deposition and trial witnesses as well as the court reporters present at these judicial proceedings. Attorney Rohn shall at the same time file copies of these letters with the Court. It is further

ORDERED that Attorney Rohn shall notify the ethics committee of each bar of which she is a member by providing each with a copy of this Order. It is further

ORDERED that Kmart file an affidavit of attorney's fees and costs associated with bringing its motion for sanctions within twenty days after the date of this Order. Attorney Rohn shall file any response within ten days thereafter. The Court thereafter will enter an order requiring Attorney Rohn to reimburse Kmart for its reasonable fees and costs in pursuing the motion.

ENTERED this 20th day of December, 1999.