Mary RHOADES, Appellant (Plaintiff),

v.

K–MART CORPORATION, Appellee (Defendant).

No. 93–38.

Supreme Court of Wyoming.

Nov. 12, 1993.

**628**

Steven R. Helling, Casper, representing appellant.

J. Scott Burnworth, Casper, representing appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

CARDINE, Justice.

Mary Rhoades (Rhoades) sued the K–Mart Corporation (K–Mart) after she slipped and fell in K–Mart's Casper, Wyo-

ming store. The trial court directed a verdict for K–Mart. Rhoades appeals from the judgment entered on the directed verdict asserting that genuine issues of fact existed which precluded a directed verdict and arguing that the trial court erred in refusing to admit certain testimony.

We reverse.

Rhoades presents the following issues:

Did the Trial Court err when it granted Appellee's (Defendant below) Motion for a directed verdict? Was there sufficient evidence for this case to go to the jury?

Did the Trial Court err in excluding testimony by Roger Ruegsegger, former assistant manager for Appellee, regarding the length of time water or liquid would have had to have been on the floor in order for the wax to have come up from the floor?

## I. FACTS

On April 26, 1988, Mary Rhoades slipped and fell while walking down an aisle of the Casper, Wyoming K–Mart store. During her testimony, she described the incident as follows:

I walked out of the aisle in to the main aisle ready to leave when my right foot hit something that felt like slime and I slipped, I slipped. I tried to catch my balance. It was like water, you'll sometimes hit a dry spot, but this was just like grease, slime, it just went zoom. It was like in a cartoon.

When she fell, Rhoades landed heavily on her left knee, then tried to get up but could not and fell on her backside. An unidentified customer was first on the scene and first to assist Rhoades. According to Rhoades' testimony, that customer noticed a medium sized cup on its side near where Rhoades slipped and surmised that it was the source of the slippery substance. After observing the cup, the customer searched further by pushing some clothes aside, which were hanging on a rack, and discovered a thin stream of water which extended six inches into the aisle where Rhoades had fallen.

As Rhoades was assisted to her feet, she slipped again; but she did not fall a second time. After being assisted to her vehicle, Rhoades and her husband drove away. When Rhoades washed the pants she was wearing when she fell in K–Mart, she discovered that the backside of the pants were covered with a dried white waxy substance.

Two K–Mart employees, who did not witness the incident, arrived on the scene shortly after Rhoades' fall. Approximately one-half hour after the incident, one of these employees found a lid and straw on the floor near where Rhoades had fallen. This same employee testified that at least twelve times that day she had passed the area where Rhoades fell, the last time just one minute before Rhoades' fall, and never saw any moisture on the floor. This employee also testified that during her ten-month employment with this K–Mart she had previously found soda pop and water on the floor three or four times and that she had previously slipped on the floor.

The floors in this K–Mart were tiled and were waxed for appearance. There was a cafeteria located at the rear of the store and a separate sandwich counter located at the front of the store where customers could purchase beverages. A K–Mart document, intended to be used as guidance for employees, titled "Safety and Environmental Health Bulletin," states:

> The third hazard of walking is the type of surface combined with the type of shoes we wear. In a working environment, employees should wear safe footgear. Metal heeltaps are hazardous on a hard-surface floor. In addition, the wrong wax, wet floors and leather and synthetic soles do not mix well for your stability while walking. *The best combination for work is a nonwaxed surface and rubber soles and heels.* [emphasis added]

The store's procedure for inspecting its floors consisted of having employees check

---

1. In our recent decision, *Clarke v. Beckwith*, 858 P.2d 293 (Wyo.1993), we abolished the historical landowner liability classifications—invitee and licensee—in favor of a single standard of care,

the floor surface as they went about their other duties.

## II. DISCUSSION

### A. DIRECTED VERDICT

#### 1. Standard of review

We review a directed verdict by examining the evidence, "without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, [to] determine whether there can be but one conclusion as to the verdict that reasonable jurors could have reached." *Vassos v. Roussalis*, 658 P.2d 1284, 1286 (Wyo.1983). We view the evidence in the light most favorable to the party against whom the motion is directed "together with all reasonable and legitimate inferences which may be drawn therefrom." *Vassos*, 658 P.2d at 1286 (*citing Carey v. Jackson*, 603 P.2d 868 (Wyo.1979)). Whether there was sufficient evidence to create an issue of fact is a question of law, thus we give no deference to the trial court's decision. *Id.* at 1287. Lastly, we note that trial courts should cautiously and sparingly direct verdicts. *Id.*

#### 2. Standard of Care

It is undisputed that K–Mart's standard of care was as follows:

> The store owner must use ordinary care to keep the premises in a safe condition, and he is charged with an affirmative duty to protect visitors against dangers known to him and against dangers which he might discover by use of reasonable care.

*Buttrey Food Stores Div. v. Coulson*, 620 P.2d 549, 552 (Wyo.1980).[1] Under that standard, Rhoades must prove either that K–Mart had actual notice, *i.e.*, that it knew of the spilled water and failed to protect Rhoades from the spill, or that K–Mart had constructive notice, *i.e.*, it should, in the exercise of reasonable care, have discovered the spilled substance. *Buttrey*, 620

ordinary care under the circumstances, but kept the applicable standard for trespassers. However, we opted to apply the new doctrine prospectively only.

P.2d at 552 (*citing Dudley v. Montgomery Ward & Co.*, 64 Wyo. 357, 374, 192 P.2d 617, 622 (1948)). In addition to the above, in *Buttrey*, we adopted the following doctrine:

"when plaintiff has shown that the circumstances were such as to create a reasonable probability that the dangerous condition would occur, he need not also prove actual or constructive notice of the specific condition * * *."

*Id.*, 620 P.2d at 552 (*quoting F.W. Woolworth Co. v. Stokes*, 191 So.2d 411, 416 (Miss.1966)). Rhoades could not prove that K–Mart had actual notice of the spilled substance. Rhoades then could avoid a directed verdict in this case only by demonstrating that there was some evidence that would create an issue of fact as to whether K–Mart, in the exercise of reasonable care, should have known of the spilled substance or that the circumstances surrounding the incident were such as created a reasonable probability that the dangerous condition would occur.

### 3. Sufficiency of the Evidence

■ The record reveals that K–Mart was not actually aware of the specific water spill involved in this incident. One of K–Mart's employees testified that she walked past the area of the spill twelve times, the last time being one minute before Rhodes fell, without noticing any liquid foreign substance on the floor. Thus, there is insufficient evidence of actual notice of this specific danger.

There was, however, evidence from which the jury could find that K–Mart, in the exercise of reasonable care, should have known of the foreign substance on the floor. Rhoades testified to the existence of the foreign substance on the floor where she fell. K–Mart's employee passed this area one minute before the accident. If the substance was there, she, in the exercise of reasonable care, should have observed it; or perhaps it was spilled sixty seconds before the incident; or perhaps there never was any slippery substance on the floor at all. That was for the jury to determine.

How long the spill had been on the floor is unknown and impossible to prove. Rhoades could do no more than present the facts available to her. She argues that the fact that the lid and straw were dry when discovered one-half hour after her fall infers that the foreign substance had been there a long time and should have been discovered in the exercise of reasonable care, so that K–Mart had constructive notice of the substance. Surely that was some evidence from which the jury could infer that the foreign substance had been on the floor for a sufficient length of time to infer constructive notice.

■ The circumstances described in the testimony may also be sufficient to suggest a reasonable probability that there would be soda and/or water spills, thus precluding the requirement that actual or constructive noticed be demonstrated. In *Buttrey* we quoted the Colorado Supreme Court's reasoning for this rule:

"However, when the operating methods of a proprietor are such that dangerous conditions are continuous or easily foreseeable, the logical basis for the notice requirement dissolves. Then, actual or constructive notice of the specific condition need not be proved."

*Buttrey*, 620 P.2d at 553 (citations omitted) (*quoting Jasko v. F.W. Woolworth Co.*, 177 Colo. 418, 494 P.2d 839, 840 (1972)). In *Jasko*, the operating methods, which made the dangerous condition involved—slipping on a slice of pizza—easily foreseeable, were: (1) a pizza counter located in the store which sold a high volume of pizza slices on waxed paper, (2) testimony that the store was often cleaning pizza spills off a slippery floor, and (3) that customers stood in the aisles eating their pizza slices. *Jasko*, 494 P.2d at 840. Based upon this "operating methods" rule, the Colorado court reversed a directed verdict because the defendant's "operating methods" raised issues concerning defendant's negligence. *Id.*, at 840–41.

This "operating methods" rule has been commonly invoked in other jurisdictions. *See generally*, Annotation, 85 A.L.R.3d

(1978); *Pimentel v. Roundup Co.*, 100 Wash.2d 39, 666 P.2d 888, 892–93 (1983) (provides explanation of the three different interpretations of this rule). More specifically, New Mexico's highest court invoked the doctrine in reversing a JNOV where the plaintiff slipped and fell while walking down a store's stairs after stepping on some gum. *Mahoney v. J.C. Penney Co.*, 71 N.M. 244, 377 P.2d 663 (1962). There, the testimony revealed that no one could say how long the gum had been present, but the store's manager of six years stated that he had previously seen gum on the stairs on several occasions and that the presence of gum on these particular stairs was a common occurrence. *Id.*, 71 N.M. at 249, 377 P.2d at 666.

Additionally, a Washington appeals court reversed summary judgment granted to a self-service restaurant in another slip-and-fall case where the evidence revealed that the plaintiff fell after slipping on a "liquid-like" substance near the self-service line for food, which tended to be a greasy area due to spills. *Ciminski v. Finn Corp., Inc.*, 13 Wash.App. 815, 537 P.2d 850 (1975). That court concluded:

> [A]n owner of a self service establishment has actual notice that his mode of operation creates certain risks of harm to his customer. Since a self-service operation involves the reasonable probability that these risks will occur, these risks are foreseeable. Thus, it is not necessary to show actual or constructive notice of the specific hazard causing injury, and it becomes the task of the jury to determine whether the proprietor has taken all reasonable precautions necessary to protect his invitees from these foreseeable risks.

*Id.*, at 854.

Like the circumstances in *Jasko, Mahoney,* and *Ciminski,* the circumstances in this case may be such that it was reasonably probable that soda or water would be spilled in this area and thus that risk was foreseeable. One of K–Mart's employees testified that, in her ten months of employment, she had found soda and water on the floors on three or four occasions prior to this incident and had in fact slipped herself. Other testimony revealed that a medium sized cup and a straw and lid were located near a thin stream of water in the aisle where Rhoades fell. Also, the store manager testified that this store had two separate places where a customer could purchase beverages. In addition, the floors of this store were waxed despite a K–Mart safety publication specifically stating that non-waxed floors were the least slippery and that liquid on waxed floors caused instability. Under these circumstances, it may be foreseeable that beverages would be spilled on these waxed floors causing slippery conditions. Therefore, whether Rhoades demonstrated constructive notice and the question of whether K–Mart acted reasonably under the circumstances was for the jury.

■ K–Mart argues that, even if Rhoades did not have to prove actual or constructive notice, the evidence demonstrated that K–Mart exercised reasonable care under the circumstances because its employee had passed down the aisle and had seen no spill one minute before Rhoades' fall. However, whether K–Mart's inspection procedures—employees looking for spills while performing other duties—were sufficient to meet the standard of ordinary care under these circumstances was a question of fact for the jury. Thus it was error to direct a verdict.

### B. EXCLUSION OF WITNESS TESTIMONY

We address this issue because of the likelihood of its recurrence at a second trial. Rhoades' asserts that the trial court erred when it excluded testimony by K–Mart manager, Roger Ruegsegger (Ruegsegger), concerning the length of time the liquid had been on the floor. Rhoades argues this issue in terms of impeachment and cross-examination of a witness, while K–Mart argues in terms of lack of foundation to qualify the witness as an expert.

The testimony at issue occurred during Rhoades' case in chief on direct examina-

tion of Ruegsegger and proceeded as follows:

[Rhoades' Counsel]: Let's take an example of a soda pop spill on the floor. Isn't it right that it would take several hours for the wax—

[K–Mart's Counsel]: Objection, Your Honor.

THE COURT: Let's hear the question.

[Rhoades' Counsel]: Isn't it true that it would take at least several hours for the wax to come up from the floor as a result of having the soda pop on it?

[K–Mart's Counsel]: This calls for the witness to speculate and there is a lack of foundation as to his expertise to testify about soda pop softening floor wax.

[Rhoades' Counsel]: Your Honor, if I could respond, this witness observed spills on the floor, he worked with waxes in his head custodian position. I think he is familiar with this area and should be permitted to testify.

THE COURT: I'll sustain the objection on foundation.

[Rhoades' Counsel]: What experience do you have with waxes?

[Ruegsegger]: As far as knowing what they are going to do, none. We put them on the floors to make the floors shiny is all I know.

[Rhoades' Counsel]: Did you work with various waxes at Garfield School?

[Ruegsegger]: Just one type that they supplied to us and told us to put down. It wasn't something that we knew it would do or wouldn't do.

[Rhoades' Counsel]: Did you ever observe the wax coming up from the floor on the K–Mart store—

[Ruegsegger]: No I didn't.

[Rhoades' Counsel]:—on East Second Street? Then how was it that you could tell me during your deposition—

[K–Mart's Counsel]: Objection. We are referring to testimony.

THE COURT: Sustained. It would be argumentative if he said something in the deposition. Read it to him.

[Rhoades' Counsel]: Mr. Ruegsegger, let me direct your attention to page 12— May I approach the witness, Your Honor?

THE COURT: Why would you want to do that?

[Rhoades' Counsel]: Just to have him read it.

\* \* \* \* \* \*

[K–Mart's Counsel]: Your Honor, counsel is attempting to get back in to an area that you just ruled Mr. Ruegsegger did not have sufficient foundation to testify about regarding softening of the wax. Now if—

\* \* \* \* \* \*

THE COURT: \* \* \* I agree. I'll sustain the defense objection.

[Rhoades' Counsel]: Your Honor, at this point, I would like to make an offer of proof.

THE COURT: All right.

(At the Bench)

[Rhoades' Counsel]: Your Honor, my offer of proof is that during his [Ruegsegger's] deposition, he was asked how long it would take for the wax to get—would it actually come up from the floor as a result of having the liquid on it, and he said it would have to set for several hours before it is going to penetrate the wax. Then he goes on to state the water and liquid didn't hurt it, you know, unless it sat there for quite a long period of time.

I think if nothing else, I should be able to use this to impeach his testimony now where he says he has no reason for knowing.

The trial court stood by its earlier ruling, excluding the testimony and denying the attempted impeachment through the deposition, because there was no foundation for Ruegsegger's opinion.

Two questions are raised concerning this disputed testimony of Ruegsegger. First, was proper foundation presented to permit Ruegsegger to answer the question concerning his knowledge of the effects of soda on floor wax? Second, was the trial

court correct in denying Rhoades' counsel's attempted impeachment of Ruegsegger?

 Since Ruegsegger was not offered as an expert, any opinion testimony elicited from him is governed by W.R.E. 701, which provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

We liberally construe this rule in favor of admitting opinion evidence of lay witnesses. *McCabe v. R.A. Manning Constr. Co., Inc.*, 674 P.2d 699, 705 (Wyo.1983). Mr. Ruegsegger testified that he had been the manager of K–Mart, which included responsibility of floor care, and that K–Mart waxed its floors. As the manager in charge of maintaining waxed floors, Ruegsegger had personal knowledge of waxing floors and the effect of spills and answered in his deposition concerning what he knew about how long it took soda to cause wax to come up from the floor. Whatever Ruegsegger might have said in response to Rhoades' counsel's question, Ruegsegger's experiences as the manager in this K–Mart store would have been a rational basis for his answer. Therefore, sufficient foundation existed for Rhoades' counsel to ask the question and for Ruegsegger to answer.

The record reflects that Ruegsegger was never permitted to answer the question which counsel insisted would have been inconsistent with his deposition. However, if the statements made in Ruegsegger's deposition concluded that it would take several hours for soda to penetrate floor wax and his testimony at trial is that he cannot make that same conclusion, then the two statements are clearly inconsistent and fair game for impeachment purposes because "[t]he credibility of a witness may be attacked by any party, including the party calling him." W.R.E. 607.

### III. CONCLUSION

We reverse the trial court's judgment entered upon K–Mart's motion for a directed verdict because the circumstances surrounding Rhoades' fall were such as would allow a reasonable jury to conclude that there was constructive notice of the existence of a foreign substance on the floor or that there was a foreseeable risk of slippery floors because of the potential soda or water spills, all of which raised jury questions of whether K–Mart acted reasonably in light of the risk.

Reversed.