

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-23-2001

# Saldana v. Kmart Corporation

Precedential or Non-Precedential:

Docket 99-4055

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

## Recommended Citation

"Saldana v. Kmart Corporation" (2001). *2001 Decisions.* Paper 164.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/164

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 23, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-4055 and 00-3749

MARIE SALDANA

v.

KMART CORPORATION

MARIE SALDANA, Appellant in No. 99-4055
LEE J. ROHN,* Appellant in No. 00-3749

*Pursuant to Rule 12 (a), F.R.A.P.

(Amended Per Court's Order of 3/16/01)

ON APPEAL FROM THE DISTRICT COURT
FOR THE DISTRICT OF THE VIRGIN ISLANDS
D.C. Civil No. 95-cv-00090
District Judge: Honorable Thomas K. Moore

Argued: May 18, 2001

Before: McKEE, RENDELL and BARRY, Circuit Judg es

(Filed July 23, 2001)

        K. Glenda Cameron, Esquire
         (Argued)
        Lee J. Rohn, Esquire
        Law Office of Lee J. Rohn
        1101 King Street, Suite 2
        Christiansted, St. Croix
        USVI, 00820

         Attorney for Appellants

Andrew C. Simpson, Esquire
  (Argued)
Suite 1
5025 Anchor Way, Gallows Bay
Christiansted, St. Croix
USVI, 00820

  Attorney for Appellee

OPINION OF THE COURT

BARRY, Circuit Judge.

This case arises from a slip-and-fall suffered by Marie Saldana at a Kmart store on St. Croix. Ms. Saldana appeals the grant of summary judgment against her while her attorney, Lee Rohn, Esq., appeals the imposition of sanctions against her for her out-of-court vulgar language in a handful of cases, including this one. The tortuous procedural history that has led to the consolidation of a slip in a puddle of car wax with sanctions for vulgar language need not detain us. Suffice it to say that we have jurisdiction under 28 U.S.C. S 1291 and will affirm the District Court's December 20, 1999 decision with respect to Saldana, but will reverse with respect to Rohn.

I.

Marie Saldana alleged in her complaint that she slipped in a puddle of car wax in a Kmart aisle on April 20, 1995 and suffered injury. No one saw the wax before Saldana fell, no one else slipped in the puddle, and Saldana did not see tracks of wax near the puddle that might indicate someone else had stepped in the spill. Saldana stated that after she fell, she noticed that the puddle measured 24 inches across and was covered with a layer of light brown dust. A Kmart employee, Eugenie Williams, had walked down the same aisle less than three minutes prior to Saldana's fall and saw no wax on the floor at that time. After Saldana fell, Williams spotted an unbroken, completely empty bottle of wax on the floor with its top off.

2

Kmart brought a motion for summary judgment. In response, Saldana offered no evidence that any Kmart representative knew of the spill. Rather, she attempted to show constructive notice through the expert testimony of Rosie Mackay, proffered as a safety engineer, and her own testimony regarding the dust on the puddle. Saldana offered two reports by Mackay: an initial report dated January 1997, and a supplemental report dated April 1997. In the January report, Mackay concluded that "K-Mart was negligent in that there was a spill, and it was not cleaned up. Ms. Saldana was the unfortunate victim of this act of poor housekeeping . . . ." App. at 361. Mackay based this conclusion in part on safety regulations promulgated pursuant to the Occupational Safety and Health Act ("OSHA"). Mackay's April report detailed the results of "pouring tests" she conducted to determine the length of time it would take for the same brand of wax to escape from an inverted bottle and form a 12-inch puddle on her kitchen floor. At her deposition, Mackay discussed additional experiments carried out in June 1997 involving open bottles lying on their sides. The District Court found Mackay's opinions and tests to be "irrelevant under Rule 402, . . . confusing or misleading under Rule 403, and . . . technically (scientifically) unreliable under Rule 702." Saldana v. Kmart, 84 F. Supp.2d 629, 636 (D.V.I. 1999). The Court also found that any observation of dust on the puddle after Saldana's fall was not relevant to the state of the wax before the fall. Id. Thus, the Court granted Kmart's motion for summary judgment.

When reviewing an order granting summary judgment, we exercise plenary review and apply the same test a district court applies. Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994). "Under Federal Rule of Civil Procedure 56(c), that test is whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." Id. (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). "In so deciding, a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Id. A court should find for the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . pleading"; its response, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. "Such affirmative evidence -- regardless of whether it is direct or circumstantial -- must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989).

Because Saldana does not allege actual notice on the part of Kmart, she would ultimately be required to show that the wax was "on the floor long enough to give [Kmart] constructive notice of this potential `unreasonable risk of harm.' " David v. Pueblo Supermarket, 740 F.2d 230, 234 (3d Cir. 1984) (quoting Restatement (Second) of Torts S 343 (1965)). Although it is uncontested that the wax was on the floor at the time of the fall, "the mere presence of the foreign substance does not establish whether it had been there a few seconds, a few minutes, a few hours or even a few days before the accident." Id. Circumstantial evidence that a substance was left on the floor for an inordinate period of time can be enough to constitute negligence; where a plaintiff points to such evidence, it is a question of fact for the jury whether, under all the circumstances, the defective condition of the floor existed long enough so that it would have been discovered with the exercise of reasonable care. Id. at 236. Put another way, Saldana must point to evidence that would allow the jury to infer that the wax was on Kmart's floor for some minimum amount of time before the accident. Only then could a jury begin to consider whether under the circumstances the amount of time indicated by the evidence establishes constructive notice.

4

To show that the wax was on Kmart's floor an unreasonable length of time, Saldana relied chiefly on the information submitted by her expert, Rosie Mackay. As the District Court noted, Federal Rule of Evidence 702 imposes three major requirements as to expert opinions: (1) the witness must be an expert; (2) the procedures and methods used must be reliable; and (3) the testimony must "fit" the factual dispute at issue so that it will assist the jury. See Kumho Tire v. Carmichael, 526 U.S. 137, 149-50 (1999); Daubert v. Merrell Dow Pharms., 509 U.S. 579, 590-93 (1993); United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985). Even if the evidence offered by the expert witness satisfies Rule 702, it may still be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. of Evid. 403.

We will assume arguendo, as did the District Court, that Mackay meets the requirements of an "expert." Even so, Mackay's reports and conclusions would not be admissible. In her January report, Mackay concluded that, although Kmart purports to follow safety procedures similar to certain OSHA regulations, "K-Mart was negligent in that there was a spill, and it was not cleaned up." App. at 361. Kmart "allowed" the wax to spill, Mackay wrote, and therefore "failed to use good, logical, prudent safety precautions." App. at 362. These conclusory statements essentially attempt to force upon Kmart a strict liability standard based on Mackay's reading of OSHA, a regulatory scheme far different from the applicable law described above. To be sure, in Rolick v. Collins Pine Co. , 975 F.2d 1009 (3d Cir. 1992), this Court found admissible an expert's opinion that the defendant violated OSHA standards. Id. at 1014. That case, however, applied Pennsylvania law, and we noted that Pennsylvania courts had previously borrowed OSHA regulations for use as evidence of the standard of care owed to plaintiffs. Id.

This case is guided by the Restatement of Torts, which governs in the Virgin Islands in the absence of a local statute. 1 V.I.C. S 4. Under the Restatement, "[t]he court will not adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an

5

administrative regulation whose purpose is found to be exclusively . . . to protect a class of persons other than the one whose interests are invaded." Restatement (Second) of Torts, S 288; see also Restatement (Second) of Torts S 286, Illust. 1 (safety statute for protection of employees does not define standard of care owed to business invitee). As we have stated, Kmart is liable in this negligence action only if it knew or should have known of the dangerous condition but failed to take reasonable steps to correct it. David, 740 F.2d at 234. Thus, Mackay's opinion that Kmart violated worker safety requirements would not assist the fact finder in deciding whether Kmart unreasonably failed to detect a wax spill that injured a business invitee. Mackay's April report includes similar conclusory statements that the District Court properly found would not be admissible at trial.

Mackay's April pour tests indicated that, depending on the technique used, a bottle of the wax at issue would take almost three minutes to empty and an additional five minutes to form a 12-inch puddle. For her June tests, Mackay altered the pour angle and found a 14- to 15-inch puddle would form in about eight minutes. The District Court believed that the primary concern with these tests was not their accuracy, but their relevancy.[1] Saldana connects these tests to the size of the Kmart puddle after her fall and argues the time involved establishes constructive notice. Undisputed evidence shows, however, that Saldana's fall and her recovery from that fall left her legs and skirt wet with car wax. This disturbance undoubtedly altered the size of the puddle; measurements of how quickly wax spreads without such interference simply have no bearing on this case.

_____

1. We note in passing, however, that Mackay conducted her pour tests on what she called a "vinyl tile surface particularly similar to the one at K-Mart." App. at 366. As we have already mentioned, this "vinyl tile surface" turned out to be Mackay's own kitchen floor, which she testified was at least 17 years old. Mackay further stated that the Kmart floor appeared to be significantly newer than her own; she also did not know whether the two floors had been cleaned with the same type of substance or resembled each other in any way relevant to her tests. We are, therefore, not persuaded that the accuracy of these tests was not also a concern.

Similarly, the time necessary for a wax bottle to empty does not, by itself, provide information regarding when the spill commenced or concluded. Nothing in the record indicates exactly when the bottle was found to be completely empty, leaving no way to deduce when the spill began. The spill may have started just as Saldana reached the aisle and continued as she fell, as she was being helped up, or even afterward. The District Court, therefore, properly rejected Mackay's reports.[2]

The only other evidence Saldana points to regarding the amount of time the wax was on Kmart's floor is her observation of dust on the puddle after she fell. We note, however, as did the District Court, that Saldana offered no evidence of how much dust was found, how long it would have taken for dust to accumulate, or whether the dust was picked up off the floor by the spreading wax or the force of Saldana's fall. Standing alone, the mere presence of dust on the wax after Saldana's fall does not inform any decision as to the amount of time the wax was on the floor before the fall.

We, therefore, find that Saldana's case rests solely on speculation that events unfolded in such a way as to render Kmart negligent.[3] There was a complete absence of relevant

_____

2. Because we find all of the pour tests irrelevant, we need not decide whether the District Court abused its discretion in excluding evidence of tests conducted after the deadline for producing expert reports. We also note that the June tests, which purport to measure the amount of time wax takes to pour out of bottles lying flat on the ground, involved emptying only half the wax out of the bottle. Saldana, however, claims that the bottle at the time of her fall was empty. Reply Br. at 19 (calling
the evidence that the bottle was completely empty an"un-controverted fact, indeed an admission.").

3. Saldana argues that a jury could find that either Williams or a second Kmart employee working behind a nearby counter negligently failed to keep a proper lookout. A jury might, indeed, find that constructive notice requires a shorter amount of time when a spill occurs in an area of the store near an employee rather than in some remote aisle far from workers' eyes. Because Saldana does not allege that Kmart had actual notice of the spill, however, the relevant question continues to be whether the wax was on the floor long enough that some Kmart representative should have known about it.

7

evidence -- from either side -- on the critical question of how long the wax was on the floor, and the mere possibility that something occurred in a particular way is not enough, as a matter of law, for a jury to find it probably happened that way. See Fedorczyk v. Caribbean Cruise Lines, 82 F.3d 69, 75 (3d Cir. 1996) (applying New Jersey law); Lanni v. Pennsylvania RR, 371 Pa. 106, 111-12 (1952) (finding of constructive notice impossible where no evidence existed to show how long oily spot was on the floor); Richardson v. Ames Ave. Corp., 525 N.W. 2d 212, 217 (Neb. 1995) (holding a store not liable for a customer's slip and fall on liquid soap where no evidence showed how long spill had existed).4 As the authors of the Restatement put it in one particularly pertinent illustration:

> A, a customer in B's store, slips on a banana peel near the door, and falls and is injured. The banana peel is fresh, and there is no evidence as to how long it has been on the floor. Since it is at least equally probable that it was dropped by a third person so short a time before that B had no reasonable opportunity to discover and remove it, it cannot be inferred that its presence was due to the negligence of B.

Restatement (Second) of Torts, S 328D, Illust. 7 (discussing res ipsa loquitur). We find the facts here indistinguishable from the Restatement example. While a plaintiff need not prove his or her case by a preponderance of the evidence to survive summary judgment, Saldana has not met even her modest burden of showing at least some relevant evidence that could support her claim. Accordingly, we will affirm the District Court's grant of summary judgment.

_____

4. Saldana cites Rhoades v. Kmart, 863 P.2d 626 (Wyo. 1993) for the proposition that whether a slippery substance was on the floor and how long it had been there are questions for the jury to determine. Rhoades, 863 P.2d at 630. The Rhoades Court noted, however, that the soda cup lid and straw found at the scene were dry, which would permit an inference that the soda had been on the floor a sufficient length of time for constructive notice. Id. at 630. The Wyoming Court also based its decision on an "operating methods" doctrine that neither party has argued applies to the present case. Id. at 630-31 (evidence showed that soda was available in the store, that soda had been spilled before, and therefore that Kmart might expect soda to be spilled at any time).

II.

While discovery was taking place in the Saldana case, Andrew C. Simpson, Esq., then of the firm of Bryant, White & Barnes, P.C., attorneys for Kmart, moved before the District Court for sanctions against Saldana's attorney, Lee Rohn, because of her use of language that he contended, in somewhat of an overstatement, violated the "fundamental precepts of legal ethics." App. at 133. As the memorandum in support of the motion succinctly put it, "[t]he basis for this motion is Attorney Rohn's repeated use of vulgarity, in particular the word `fuck,' towards other members of the bar." Id. The motion was prompted by Rohn telling Simpson, in the course of a disagreement on the telephone over scheduling depositions, "you know, Andy, go fuck yourself." Id. at 178. The memorandum complained that Rohn "routinely" used the word "fuck" upon disagreeing with opposing counsel. Id. at 134.

A few preliminary comments. First, we do not condone Rohn's concededly rather free-wheeling use of the word "fuck," and nothing that follows should be taken as any indication that we do. Second, there is no contention that at any time Rohn used that word or any vulgar language before the District Court or in any document submitted to the Court. Third, there is a long and not particularly happy history between Rohn and at least one other member of the Bryant firm in addition to Simpson who, we note, rebuffed Rohn's immediate attempt to apologize after the telephone incident. This history is not only readily apparent from the rather scathing submissions made by both sides, but from the fact that the motion and memorandum, although filed a mere three days after the fateful telephone disagreement, included a host of exhibits documenting, among other things, numerous occasions on which Rohn used the word between October 1993 and February 1997. This litany of incidents prompted Rohn to conclude that the firm had been "accumulating ammo" against her, id . at 190; whether or not that be the case, the history here certainly permits the conclusion that the firm's attempt to portray itself as something akin to a knight in shining armor protecting the bar and the public from "such conduct" and preventing the "further degradation of the administration of justice and the

reputation of the Virgin Island Bar," id. at 136–37, may well be overstating its case.

Rohn opposed Kmart's motion, and the District Court held a hearing, which, by order of the Court, was to have been limited "solely to the issue of Attorney Rohn's behavior in this case." Id. at 367. After the hearing commenced, however, the Court stated that it had not intended by that order to limit the inquiry to this case but, rather, had intended to limit the inquiry to Rohn's behavior in District Court cases, and the scope of the hearing expanded accordingly. Id. at 494, 496.5  Kmart essentially rested on its papers and only Rohn testified, apologizing in the course of her testimony and promising to refrain from use of the word in the future. The Court, seemingly satisfied that Rohn had seen the error of her ways, barely touched on the issue of sanctions but stated that an opinion should and would issue giving very clear advice to the bar as to how attorneys are supposed to conduct themselves in and out of court. Id. at 537. That opinion issued more than two years after the hearing when the Court invoked Local Rule 83.2 and, in very strong language, sanctioned Rohn by ordering her to attend a legal education seminar on civility in the legal profession, write numerous letters of apology to all whom "she demeaned and insulted by her vulgarity and abusive conduct," apologize to the court reporters present at any of those proceedings, and pay the attorneys' fees and costs associated with bringing the sanctions motion. Saldana, 84 F.Supp. at 641.6

We generally review a court's imposition of sanctions for abuse of discretion. Chambers v. NASCO, 501 U.S. 32, 55 (1991); In re: Tutu Wells Contamination Litigation, 120 F.3d 368, 387 (3d Cir. 1997). When the procedure the District Court uses in imposing sanctions raises due process issues of fair notice and the right to be heard, this Court's review

_____

5. We note, without comment, that when the motion was filed, Rohn sought a continuance so that witnesses to the conduct alleged in the motion could be available to testify on her behalf. The Court denied the motion and entered the above quoted order. Thus, when, without notice, the hearing expanded, only Rohn was there to testify.

6. Those fees and costs were later determined to be $4,542.00.

10

is plenary. Tutu Wells, 120 F.3d at 387; Martin v. Brown, 63 F.3d 1252, 1262 (3d Cir. 1995).

Rohn argues with considerable force that the District Court violated her due process rights to fair notice by failing to specify in advance of the hearing that sanctions would or at least could be premised on Local Rule 83.2. Generally, "[t]he Due Process Clause of the Fifth Amendment requires a federal court to provide notice and an opportunity to be heard before sanctions are imposed on a litigant or attorney." Martin, 63 F.3d at 1262. In particular, "[t]he party against whom sanctions are being considered is entitled to notice of the legal rule on which the sanctions would be based, the reasons for the sanctions, and the form of the potential sanctions." Tutu Wells, 120 F.3d at 379 (citing Simmerman v. Corino, 27 F.3d at 58, 64 (3d Cir. 1994)) (emphasis in the original). "[O]nly with this information can a party respond to the court's concerns in an intelligent manner." Id. In other words, a party cannot adequately defend himself or herself against the imposition of sanctions unless he or she is aware of the issues that must be addressed to avoid the sanctions. Id.

Local Rule 83.2, which was adopted by the District Court in furtherance of the Court's inherent power to supervise attorney conduct and essentially codifies certain aspects of that power, was first mentioned by the Court in its opinion imposing sanctions, when it purported to base its sanctioning authority on that rule. That notification simply came too late, however, because Rule 83.2 was never pressed by Kmart as the basis for sanctions, was never mentioned at the hearing,7 and no one -- not the Court, not Kmart, and not Rohn -- ever even alluded to the procedures of Rule 83.2(b)(5), much less argued why they should, or should not, be followed.8

_____

7. The passing reference in a footnote in Kmart's reply to Rohn's opposition to the sanctions motion to the fact that the Court could "also" use Rule 83.2 to investigate "all" Rohn's misconduct, App. at 300, is the only prior reference to Rule 83.2. Thus, the District Court's statement that Kmart "relied heavily" on that Rule, id. at 634, was erroneous.

8. Under Rule 83.2(b)(5), the Chief Judge, if he deems it appropriate, shall refer a complaint to counsel to investigate and prosecute a

While Rohn clearly did not have notice that sanctions could be imposed under Rule 83.2, she just as clearly did know that a Court has the inherent authority to impose sanctions and knew that sanctions up to and including a suspension of her license to practice were a possibility, although given the Court's last minute apparent about-face as to the scope of the hearing, it is less than clear what conduct she had notice would be considered for purposes of sanctions. We need not, however, decide whether an imposition of sanctions can be affirmed even after the purported basis of those sanctions has been rejected or whether there was some failure of due process, because we find that the quality and quantity of the transgressions found by the District Court -- four uses of the word "fuck," two in telephone conversations with attorneys and two in asides to attorneys during depositions, and a post-verdict letter in which Rohn concurred with a juror who described an expert witness as a "Nazi" -- simply do not support the invocation of the Court's inherent powers. Stated differently, we agree with Rohn that her use of language, while certainly not pretty, did not rise to the level necessary to trigger sanctions, at least under the Court's inherent powers.9

> "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect[ ] and decorum[ ] in their presence, and submission to their lawful mandates." Anderson v.

_____

formal disciplinary proceeding or make some other appropriate recommendation. The order of reference to counsel, and all further proceedings until the issuance of an order initiating a formal disciplinary
action, shall be under seal. A judge would hear the matter and thereafter submit findings of fact, conclusions of law, and any recommendation to the full Court for action.

9. Parenthetically, we note, in this connection, our dismay that Mr. Simpson, in the memorandum in support of this motion, attempted to portray Rohn's conduct as "far more egregious than that of the attorney in In re Tutu Wells," App. at 136, a case in which, among other things, the attorney in question during a status conference before the court "made an obscene gesture, pantomiming masturbation" while a woman attorney was making a presentation on behalf of her client. In re: Tutu Wells, 31 V.I. 175, 177 (D.V.I. 1994).

12

Dunn, [19 U.S. 204, 227] (1821); see also Ex parte Robinson, [86 U.S. 505, 510] (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Link v. Wabash R. Co. , 370 U.S. 626, 630-631 (1962).

Prior cases have outlined the scope of the inherent power of the federal courts. For example, the Court has held that a federal court has the power to control admission to its bar and to discipline attorneys who appear before it. See Ex parte Burr, [22 U.S. 529, 531] (1824). While this power "ought to be exercised with great caution," it is nevertheless "incidental to all Courts." Ibid.

Chambers, 501 U.S. at 43. The Chambers Court also warned that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Id. at 44 (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980). We have, on more than one occasion, repeated that admonition. See, e.g., Prosser v. Prosser, 186 F.3d 403, 406 n.4 (3d Cir. 1999); Martin, 63 F.3d at 1265; Fellheimer, Eichen & Braverman, P.C., v. Charter Technologies, Inc., 57 F.3d 1215, 1224 (3d Cir. 1995).

The language complained of in this case did not occur in the presence of the Court and there is no evidence that it affected either the affairs of the Court or the"orderly and expeditious disposition" of any cases before it. Moreover, as the Chambers Court observed, a court should normally look first to rule-based or statute-based powers and reserve inherent powers for those times when rule- or statute-based powers are not "up to the task." Chambers, 501 U.S. at 50. As we put it in Martin, "[g]enerally, a court's inherent power should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exists," presumably why the Court, albeit belatedly, purported to base these sanctions on Rule 83.2. Martin, 63 F.3d at 1265.

In addition to the fact that were sanctions warranted, Rule 83.2 would have been "up to the task," nothing

13

"egregious" is evident here. Indeed, the District Court described itself as a "kindergarten cop" refereeing a dispute between attorneys. Saldana, 84 F. Supp.2d at 640. The petty and long-simmering nature of the dispute is, perhaps, best seen in some of the icing put on the cake: In addition to using the word "fuck," Rohn allegedly "sucked her teeth" (whatever that means) at a witness during a deposition, App. at 136; on another occasion, she used the word "bullshit," id. at 301; she also "frequently raises her voice to an unacceptable level," id. at 293; and once, after getting an answer she did not like at a deposition, she "pantomimed a gagging gesture (placing her finger in her mouth as if triggering the vomiting reflex)," with her side of the story being that she was trying to remove a splinter from her finger. Id. Rohn, of course, fought back at the same high level. Within a few days of the filing of the sanctions motion, for example, she had canvassed other plaintiffs' counsel and confirmed that "they have had to hang up on Attorney Simpson due to his rudeness and also find him rude and obnoxious to deal with." Id . at 125. Shortly thereafter, Rohn's partner submitted an affidavit stating that he had "on over a dozen occasions, utilized the `F ' word in discussions with Attorney Simpson" as well as in "literally hundreds of phone calls with other lawyers" without receiving one complaint; he also stated that "Simpson has similarly utilized the `F ' word." Id. at 199.

We thus return to where we began -- a handful of uses of the word that supposedly so offended counsel for Kmart that he felt compelled to move for sanctions under the Court's inherent powers. Because the District Court abused its discretion in granting that motion, we will reverse.

III.

For the reasons set forth above, the judgment of December 20, 1999 will be affirmed in part and reversed in part.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

14