**VIRGIN ISLANDS BUREAU OF INTERNAL REVENUE,**
Plaintiff,

v.

**THE CHASE MANHATTAN BANK,**
Defendant and Third Party
Plaintiff,

**William Lansdale, Third
Party Defendant.**

No. 1993–093.

District Court, Virgin Islands,
D. St. Thomas and St. John.

July 30, 2001.

Richard M. Prendergast, Asst. Attorney General, St. Croix, VI, for the plaintiff.

Elizabeth A Clark, Lawrence M. Hill, St. Croix, VI, for the defendant/third party plaintiff.

Henry C. Smock, St. Croix, VI, for the third party defendant.

## MEMORANDUM

MOORE, District Judge.

The Virgin Islands Bureau of Internal Revenue [the "VIBIR"] and Chase Manhattan Bank ["Chase"] have both moved for summary judgment. Chase has also asked for leave to file an amended answer to add, *inter alia,* a bad faith counterclaim against the VIBIR. For the reasons set forth below, the Court will grant the VIBIR's motion with respect to the two levies at issue and Chase's motion with respect to the fifty-percent penalty sought by the VIBIR. The Court will also deny Chase's motion for leave to amend its answer.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves two notices of levy served on Chase by the VIBIR, the first on April 22, 1991 ["1991 levy"], and the second on May 20, 1992 ["1992 levy"]. Both levies arise out of unpaid tax liabilities of certain taxpayer corporations [collectively the "Lansdale corporations"]

owned by William Lansdale ["Lansdale"] and his wife Marianthi Lansdale [collectively the "Lansdales"] who at various times maintained accounts with Chase.

The VIBIR is the agency of the Government of the Virgin Islands ["government"] charged with administering and enforcing income tax laws in the United States Virgin Islands. Chase is a national bank doing business in the Virgin Islands. The VIBIR alleges that Chase failed to honor the 1991 and 1992 levies by not turning over a certificate of deposit ["CD"] belonging to the Lansdale corporations. Chase counters that it turned over to the VIBIR all the property and property interests of the taxpayer identified in each levy at the time each notice was served. Chase argues that, with respect to the 1991 levy, it was under no duty to surrender property in the name of successor corporations not specified in the first notice of levy, and that it held no property or rights in property of the taxpayer by the time the notice of the 1992 levy was served, having previously acquired complete ownership of the taxpayer's CD.

## A. Factual Background

In early 1981, Lansdale learned about a perceived tax loophole available in the Virgin Islands and derived from the interplay between section 28(a) of the 1954 Revised Organic Act of the Virgin Islands ["Section 28(a)"] and the so-called "inhabitant rule" of 26 U.S.C. § 882 [Internal Revenue Code or "I.R.C."] as mirrored in the Virgin Islands. In theory, the loophole would allow a foreign (non-Virgin Islands) corporation to avoid income tax on its stateside and worldwide income.[1]

Despite being warned by his tax attorney that "there's always a possibility that he could lose," Lansdale assumed that risk and set up a company to take advantage of the purported tax loophole.[2] In March of 1981, Mr. Lansdale established La Isla Virgen, Inc. ["La Isla Virgen" or "LIV"], a Delaware corporation, and qualified it as an inhabitant and 28(a) company in the Virgin Islands to avoid paying tax on the substantial gains to be realized upon the redemption of his interest in a limited partnership in certain oil and gas properties. The Lansdales were LIV's sole shareholders and William Lansdale acted as its president and a director. As is well known by now, the Lansdales lost the gamble. *See Danbury, Inc. v. Olive*, 820 F.2d 618 (3d Cir.), *cert. denied*, 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 393 (1987) (section 28(a) does not permit taxpayers to escape taxation on United States source income).

In the meantime, on August 20, 1985, LIV purchased a CD from Chase for $800,000, and later that year, increased the amount to $1.2 million. A senior officer approval memorandum recommended approval "based on the security position of the loan and Mr. Lansdale's connection with La Isla Virgen." (Gov't Ex. O–3 (Mem., Aug. 1, 1985).) As early as March 15, 1985, Chase was on notice from LIV's accountant that "the V.I. Bureau of Internal Revenue was billing his Section 28A company's [sic] for tax payment deficiencies . . . ." (Gov't Ex. O–1 (Memo to file from Chase Vice President, Mar. 15, 1985).) On March 18, 1986, Lansdale personally borrowed $1.2 million from Chase. Purporting to act on behalf of LIV, he

---

1. For a more complete discussion of the so-called section 28(a) loophole and its demise, see *VIBIR v. Lansdale*, Civ. No.1998–243, slip op. at 3–8 (D.V.I. St. Thomas & St. John Div. July 30, 2001).

2. Gov't Ex. N ¶¶ 39, 43 (Stipulation, *La Isla Virgen, Inc. v. Olive*, Civ. Nos.1986–263, 1988–012, and 1988–270 (D.V.I. St. Thomas & St. John Div. Oct. 25, 1990)).

signed a hypothecation agreement and a collateral promissory note pledging and assigning to Chase a security interest in, general lien upon, and right of set-off against LIV's $1.2 million CD.[3]

As a part of litigating the validity of the so-called section 28(a) loophole, in 1986, 1987, and 1988, the VIBIR issued timely notices of deficiency of income taxes to LIV for tax years ending February 1982, 1983, 1984, 1985, and 1986. La Isla Virgen petitioned this Court to redetermine its tax deficiencies. The Court consolidated the petitions and ultimately ruled in favor of the VIBIR. *See La Isla Virgen, Inc. v. Olive*, Civ. Nos.1986–263, 1988–012, and 1988–270 (D.V.I. St. Thomas & St. John Div. Feb. 28, 1991) (Giles, J.), *aff'd*, 27 V.I. 462, 952 F.2d 1393 (3d Cir.1991).[4] The ruling allowed the VIBIR to finally assess the tax deficiencies for these years against LIV.

At the same time LIV was litigating its tax deficiencies, the Lansdales were ar-ranging for it to "disappear." On November 29, 1988, the Lansdales merged LIV into Marina Pacifica Oil Company ["Marina Pacifica"], a California corporation also wholly owned by the Lansdales, leaving Marina Pacifica the sole surviving entity. Chase Bank kept up on the status of its section 28(a) customer, as evidenced by a memo dated December 14, 1988, noting that, "when the loophole was closed retroactively in 1986, La Isla Virgin was one of the only two companies to secure special concessions from Congress. It later sought an exemption from future taxes to the U.S. or the Virgin Islands." (Gov't Ex. O–2 (Mem., Dec. 14, 1988).) On January 18, 1989, Marina Pacifica purchased a renewal CD from Chase for $1,487,371.95 using funds from the LIV certificate of deposit. Lansdale, now in his capacity as president of Marina Pacifica, signed a new assignment of interest and hypothecation agreement on February 24th, thereby

---

3. Chase has admitted in this proceeding that it treated Lansdale and his corporations as a single entity. (Chase Mem. Opp'n to Mot. Summ. J. at 33 ("Lansdale was a debtor of the Bank for the amount of the loan, and the Bank was a debtor of Lansdale for the amount of the certificate of deposit . . . .").) Indeed, Chase has provided no corporate documents granting Lansdale authority to pledge corporate assets for his personal benefit.

4. The principle issue in *La Isla Virgen, Inc.* was whether Congress had relieved LIV of its United States source income tax liability to the Virgin Islands for the years 1982 to 1986 when it excepted LIV from the retroactive repeal of the perceived loophole in the Tax Reform Act of 1986 ["TRA 1986"]. During the same time period, the director of the VIBIR appealed this Court's decision upholding the 28(a) loophole in *Danbury, Inc. v. Olive*, 627 F.Supp. 513 (D.Vi.1986).

The TRA 1986 closed the perceived loophole for tax years 1987 and forward, and retroactively for pre–1987 "open" tax years (tax years for which the statute of limitations had not run for assessing an income tax defi-ciency). Two corporations, LIV and Bizcap, successfully lobbied Congress to exclude them from the retroactive closing of the loophole. *See* Tax Reform Act of 1986, Pub.L. No. 99–514, Title XII, § 1277(c)(2).

Shortly after the TRA 1986 was enacted, the Court of Appeals ruled that the section 28(a) loophole never existed in the first place. *See Danbury, Inc. v. Olive*, 820 F.2d 618 (3d Cir.), *cert. denied*, 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 393 (1987). Subsequently, the Court of Appeals ruled that the statutory exception from the legislative closing of a loophole did not relieve Bizcap of its liability to the VIBIR for the earlier tax years because the loophole had never existed. *See Bizcap v. Olive*, 892 F.2d 1163 (3d Cir.1989), *cert. denied*, 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990).

This Court in *La Isla Virgen, Inc.*, applied the Court of Appeals' reasoning from *Bizcap* that section 1277(c)(2)(E) of the TRA 1986 did not relieve the Lansdale corporations of their tax liability to the Virgin Islands for United States source income for the years 1982 to 1986, thus opening the way for the VIBIR to assess tax deficiencies against them.

granting Chase a security interest in the renewal CD.

On May 8, 1989, senior Chase officers signed off on a senior officer approval memorandum noting the merger of LIV into Marina Pacifica and recommending reapproval of the cash collateralized line of credit to William Lansdale. (Gov't Ex. O–4.) The memo recited that Lansdale was the majority shareholder and president of Marina Pacifica and

> was also the 100% owner of our former customer La Isla Virgen, Inc., which during 1988 ceased to be, merging into [Marina Pacifica] which survived the merger. *Marina Pacifica Oil resultantly possesses all the debts and obligations of the former LIV.* Additionally, the merger agreement provided for the preservation of *all the rights of creditors relative to all liens upon any property of LIV, and provided for the attachment of such liens to the surviving corporation.*

(*Id.*) (emphasis added) The memo noted that "Lansdale remained a profitable customer," that "Chase's personal financial services should be marketed to Mr. Lansdale to maintain this profitable relationship," and concluded with the handwritten notation that Lansdale was a "wealthy Californian—supposedly close to Ronald Reagan [and] should be marketed . . . ." (*Id.*) On November 17, 1989, William Lansdale paid off all but $600,000 of his personal loan.

On February 28, 1991, the Court granted summary judgment awarding VIBIR $21,895,969.00 for LIV/Marina Pacifica's unpaid taxes, interest, and penalties in *La Isla Virgen Inc.* Wasting no time, Lansdale wrote Chase in February, March, and April on Marina Pacifica letterhead requesting that Chase transfer $50,000, $50,000, and $130,000, respectively, from the CD to a Chase bank account in Marina Pacifica's name. Each time Chase transferred the funds, the sum deposited was immediately withdrawn by a check written against the account.

On April 9, 1991, the VIBIR issued a notice of lien against La Isla Virgen in the amount of $21,895,969.00 for unpaid taxes, interest, and penalties. On April 22, 1991, the VIBIR served Chase with notice of the 1991 levy, identifying the taxpayer as "La Isla Virgen." On that date, the balance remaining in Marina Pacifica's CD was $1,304,138.17 and the outstanding principal balance of Lansdale's person loan was $600,000. On May 7, 1991, in response to the 1991 Notice, Chase remitted to the VIBIR $5,058.53 from the only account remaining in La Isla Virgen's name, labeled "LIV Building Account." Chase took this stance even though it knew full well that Marina Pacifica was the corporate successor to LIV, had used LIV assets to purchase the CD in its name, had assumed LIV's debts and obligations, and had transferred all creditors' liens on LIV's property to Marina Pacifica, including its CD with Chase.

Having been duly notified by Chase of the 1991 levy, Lansdale wrote Chase on May 12, 1991, requesting that Chase transfer $724,696.02 to a Marina Pacifica account in California. Chase refused because, it claims, the requested amount would have reduced the balance of the CD to $578,642.15, which was less than the $600,000 collateral required for Lansdale's personal loan. Lansdale reduced the amount requested to $703,338.17 and Chase paid that amount to the Marina Pacifica account, leaving a balance of $600,000 in the CD.

On June 21, 1991, Lansdale remitted to Chase $2,157.82 by Marina Pacifica check to cover an overdraft from the "LIV Building Account" and requested by letter on Marina Pacifica letterhead that the ac-

count be closed. Chase accepted the check and closed the account, again confirming its knowledge that LIV's debts were Marina Pacifica's obligations. Meanwhile, the transfer of funds, mostly interest, from Marina Pacifica's CD to its California account continued over the next year. On March 17, 1992, Marina Pacifica merged into Lonesome Dove Petroleum Company, a Texas corporation, again wholly owned by the Lansdales. On May 18, 1992, Lansdale advised Chase that Marina Pacifica had assigned its interest in the CD to Lonesome Dove. On May 20, 1992, the VIBIR served Chase with notice of the 1992 levy, this time identifying the taxpayer as La Isla Virgen, Marina Pacifica, and/or Lonesome Dove. On that day, the balance of the funds in the CD was initially $606,167.51, but the bank nevertheless wired the accumulated interest, $6,167.51, to Lonesome Dove's Texas bank account, leaving $600,000 in the CD.

A week later, on May 27, Chase sent a letter to its local counsel advising him of the notice of levy and indicating its desire to setoff the balance of the CD against the balance of Lansdale's loan. Counsel responded that he was "unable to vouch for the seniority of Chase's lien," but "concur[ed] . . . with [the] decision to setoff the deposit with Chase against the loan owed to Chase." (Gov't Ex. X–4.) Two days later, a second vice president of Chase authorized the setoff of the CD against the loan. He then sent a letter to Lansdale, demanding payment of the balance of the loan. On June 5, 1992, Chase applied the balance of the CD against Lansdale's personal loan. Chase never remitted any funds to the VIBIR in response to the 1992 notice and a later 1993 final demand.

## B. Procedural Background

On June 16, 1993, the VIBIR sued Chase for failure to comply with the 1992 levy. The complaint sought the value of the taxpayer's property held by Chase at the time of the 1992 notice, plus interest, plus a fifty percent penalty for failure to remit without good cause. On June 30, 1994, the parties stipulated to dismissal with prejudice of the fifty percent penalty in exchange for Chase filing a third-party complaint against Lansdale. On July 6, 1994, Chase moved to add Lansdale as a third-party defendant, which the Court granted on August 4th of the same year.

On May 19, 1997, the VIBIR moved to amend its complaint to add a count for failure to comply with the 1991 levy, which the Court granted. The amended complaint also sought a fifty percent penalty for failure to comply with the 1991 levy. The VIBIR and Chase filed cross-motions for summary judgment in 1999. This Court heard argument on the motions and took the matter under advisement.

## II. MOTIONS FOR SUMMARY JUDGMENT

The Court will grant the VIBIR's motion for summary judgment on both tax levies because Chase well knew that its customer, Marina Pacifica, had become the taxpayer named on the 1991 notice of levy and assumed responsibility for all of LIV's debts, obligations, and tax liens, and because the taxpayer retained a property interest in the CD at the time Chase received notice of the 1992 levy.

## A. Summary Judgment Standard

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue respecting any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Sharpe v. West Indian Co.,* 118 F.Supp.2d 646, 648

(D.Vi.2000). The nonmoving party may not rest on mere allegations or denials, but must establish by specific facts that there is a genuine issue for trial from which a reasonable juror could find for the non-movant. *See Saldana v. Kmart Corp.*, 42 V.I. 358, 360–61, 84 F.Supp.2d 629, 631–32 (D.Vi.1999), *aff'd in part and rev'd in part*, 260 F.3d 228 (3d Cir.2001). Only evidence admissible at trial shall be considered and the Court must draw all reasonable inferences therefrom in favor of the nonmovant. *See id.*

### B. Assessment and Collection of Virgin Islands Income Tax

■ The VIBIR cites to several provisions of the Internal Revenue Code of the United States, Title 26 of the United States Code in support of its position. Because the statutory provisions at issue in this case are administrative and procedural in nature, the Court must first determine whether the Internal Revenue Code applies to the VIBIR's collection and assessment procedures in this case. For the reasons stated below, the Court holds that the VIBIR's administrative assessment and collection procedures are set forth exclusively in Part II, Subtitle 1 of Title 33 of the Virgin Islands Code (33 V.I.C. §§ 701–1965), and not as mirror images of the federal administrative procedures set forth in the Internal Revenue Code.

■ The substantive provisions of the Internal Revenue Code were applied to the Virgin Islands by the Naval Service Appropriation Act of July 12, 1921, 48 U.S.C.

§ 1397 (popularly known as the Naval Service Appropriation Act, 1922) [5]:

> The income tax laws in force in the United States of America and those which may hereafter be enacted shall be held to be likewise in force in the Virgin Islands of the United States, except that the proceeds of such taxes shall be paid into the treasuries of said islands.

When the Virgin Islands Code was prepared and enacted into positive law on May 16, 1957, as directed by section 8(c) of the Revised Organic Act of 1954 ["Revised Organic Act"],[6] it incorporated this provision as the basis of the Virgin Islands income tax law. Thus, 33 V.I.C. § 1931(15) provides:

> "Virgin Islands income tax law" means so much of the United States Internal Revenue Code as was made applicable in the Virgin Islands by the Act of Congress entitled "An Act making appropriations for the naval service for the fiscal year ending June 30, 1922, and for other purposes," approved July 12, 1921 (48 U.S.C. § 1397).

This statute effectively created a separate territorial income tax to be collected by the Government of the Virgin Islands (through the VIBIR, *see* 33 V.I.C. §§ 680–683) applying the substantive provisions of the United States income tax laws *mutatis mutandis* under what has become known as the "mirror theory." *See Brent v. Quinn*, 21 V.I. 73, 74–75, 589 F.Supp. 810, 811 (D.Vi.1984). Under the mirror theory, any changes to, interpretations of, regulations and revenue rulings on, and court interpretations of the substantive tax pro-

---

**5.** Although enacted in 1921 (hence the "Naval Service Appropriation Act of July 12, 1921"), the appropriation was for the fiscal year ending June 30, 1922 (hence the "Naval Service Appropriation Act, 1922").

**6.** *See* Revised Organic Act of 1954 § 8(c); 48 U.S.C. § 1574(c). The complete Revised Or-

ganic Act of 1954 is found at 48 U.S.C. §§ 1541–1645 (1995 & Supp.2000), *reprinted in* V.I. CODE ANN. 73–177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp.2000) (preceding V.I. CODE ANN. tit. 1) ["REV. ORG. ACT"].

visions of the Internal Revenue Code are applicable to Virgin Islands tax cases as long as the particular provision at issue is "not 'manifestly inapplicable or incompatible' with a separate territorial income tax ...." *See Chicago Bridge & Iron Co. v. Wheatley,* 7 V.I. 555, 562, 430 F.2d 973, 976 (3d Cir.1970).

Application of the mirror theory is guided by the "equality principle" to ensure that the amount of tax paid by a resident of a territory to its territorial government is the same as the amount the taxpayer would pay to the United States if she or he were resident in a state of the United States. *See id.,* 7 V.I. at 562, 430 F.2d at 975–76.[7] The result of this evolution is that the *substantive* Virgin Islands income tax law today consists of the mirror provisions and interpretations of the United States Internal Revenue Code, divined by substituting "Virgin Islands" for "United States," and "Virgin Islands Bureau of Internal Revenue" for "Internal Revenue Service" in a manner consistent with the equality principal and not manifestly inapplicable or incompatible with a separate territorial income tax. The mirror theory applies only to the substantive provisions of the Internal Revenue Code that determine the amount of tax and not to the administrative assessment and collection provisions of the federal law. *See Vitco, Inc. v. Government of Virgin Islands,* 560 F.2d 180, 185 (3d Cir.1977) (substantive equality of treatment between mainland taxpayer and Virgin Islands taxpayer is goal of mirror system); *Chicago Bridge,* 7 V.I. at 560–61 n. 2, 430 F.2d at 975 n.2 ("*[S]ubstantive* provisions of the Internal Revenue Code were made applicable in the Virgin Islands by congressional enactment in the Naval Service Appropriation Act of 1922.") (emphasis added); *Dudley v. Commissioner of Internal Revenue,* 3 V.I. 685, 693, 258 F.2d 182, 187 (3d Cir.1958) ("Congress understood that the provisions of the internal revenue laws of the United States relating to tax administration and enforcement ... were without application to the Virgin Islands.").

Because the Virgin Islands income tax is a separate territorial income tax, assessed and collected locally, the Virgin Islands adopted its own procedural law for assessing and collecting its income tax. When the Legislature enacted the Virgin Islands Code on May 16, 1957, it included Part II, Subtitle 1 of Title 33, entitled "Procedure and Administration," which at the time encompassed sections 701 to 1965 of Title 33.[8] These sections were largely derived from Subtitle F, sections 6001 to 7851 of the Internal Revenue Code of 1954, providing for the assessment and collection of United States income tax, although not all of the federal provisions were carried over

**7.** The *Chicago Bridge* court stated the substantive nature of the equity principle with respect to the Territory of Guam and its income tax laws:

The equivalent mirror system of taxation in Guam has been the subject of congressional and judicial interpretations that indicate the extent to which the Internal Revenue Code should be modified in its application as a separate territorial income tax. The decisions construing the original Guamanian tax statute agreed that *"the tax to be paid ordinarily is measured by the amount of income tax the taxpayer would be required to pay to the United States of America if the* taxpayer were residing in the continental United States," and that the literal terms of the Internal Revenue Code should be modified only by "those nonsubstantive changes in nomenclature as are necessary to avoid confusion as to the taxing jurisdiction involved."
7 V.I. at 562, 430 F.2d at 975–76 (quoting *Wilson v. Kennedy,* 123 F.Supp. 156, 160 (D.Guam 1954), *aff'd,* 232 F.2d 153 (9th Cir. 1956)) (footnote omitted) (emphasis added).

**8.** In 1980, the Legislature added sections 680–683 to create the VIBIR.

into Virgin Islands law.[9] *See* 33 V.I.C. § 701–1965 (1957); *see also* derivation table provided at pages 107–09 of 5 *Virgin Islands Code Ann.* (1995) (preceding 33 V.I.C. § 680). Since the Virgin Islands has enacted its own procedure for income tax enforcement, the VIBIR is limited to those provisions in assessing and collecting Virgin Islands income tax.

The Virgin Islands Code provides that the first step in collecting delinquent income taxes is the issuance of a notice of deficiency to the taxpayer. *See* 33 V.I.C. § 942. A taxpayer who receives a notice of deficiency in most cases has ninety days to petition the Court for a redetermination of the tax deficiency, both in regard to its validity and its amount. *See id.* § 943(a). In this case, the Lansdale corporations filed timely petitions which the district court decided on the merits in favor of the VIBIR. Thereafter, the failure of LIV and Marina Pacifica to pay resulted in a lien in the assessed amount in favor of the Virgin Islands on "all property and rights to property" belonging to LIV and Marina Pacifica. *See id.* § 1031.[10]

The lien "shall arise at the time the assessment is made and shall continue until the liability ... is satisfied or becomes unenforceable by reason of lapse of time." *Id.* § 1032. Once a tax lien arises, the government may sue in district court to enforce the lien pursuant to 33 V.I.C. § 1663.[11] Additionally, the VIBIR may levy on the lien administratively as a "provisional remedy" designed to protect the government against diversion or loss while the VIBIR seeks to collect on the lien. *See id.* § 1051(a). When levying against a taxpayer's property held by another, the VIBIR serves a notice of levy upon the holder, which gives it the right to all property levied upon and creates a custodial relationship between the person holding the property and the VIBIR so that the property comes into the constructive possession of the government. *See* 33 V.I.C. § 1052(a); *United States v. National Bank of Commerce*, 472 U.S. 713, 720, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985) (interpreting comparable provision of the Internal Revenue Code). With this understanding of how an administrative levy arises under the Virgin Islands Code, I will now turn to the two levies at issue in this case.

## C. The 1991 Levy

The material facts concerning the 1991 levy are undisputed, making it ripe for summary judgment. Chase admits that, at the time it received notice of the 1991 levy naming LIV as the delinquent taxpayer, it owned property or property rights belonging to Marina Pacifica, to wit, the CD. (Gov't Ex. Z–2) (Def.'s Resp. to Pl.'s Req. for Admis. [hereinafter "Resp."] 28.) It also is undisputed that Marina Pacifica was the successor corporation of LIV, and

---

9. Although the interpretations of, regulations and revenue rulings on, and court interpretations of Sections 6001 thru 7851 of the Internal Revenue Code are not binding on this Court, they nonetheless can be persuasive authority for the application and interpretation of the comparable sections of the local code.

10. Section 1031 states in relevant part:
    If any person liable to pay any internal revenue tax neglects or refuses to pay the same after demand, the amount ... shall be a lien in favor of the government of the United States Virgin Islands upon *all prop-*

*erty and rights to property,* whether real or personal, belonging to such person."
33 V.I.C. § 1031 (emphasis added).

11. "All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto." *Id.* § 1663(b). The suit is a plenary action in which the court "shall ... adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property." *Id.* § 1663(c).

that all liens upon any property of LIV were preserved and remained attached to the same property held by Marina Pacifica after the merger. (Gov't Ex. O–4 (Chase memo acknowledging that "Marina Pacifica Oil resultantly possesses all the debts and obligations of the former LIV" and the merger agreement preserved "all the rights of creditors relative to all liens upon any property of LIV, and provided for the attachment of such liens to [Marina Pacifica]."); Resp. 5, 25, 26.) Senior officers at Chase were not only aware of these facts, but used them to protect Chase's own interests. (Gov't Ex. O–4 ("After being informed of the merger between LIV and [Marina Pacifica], the RM sent new assignment and hypothecation documents and a new corporate resolution in the name of [Marina Pacifica] to be signed by Mr. Lansdale [as security for the loan to him].").) Further, Chase was well aware that the funds used to purchase the Marina Pacifica CD came from the LIV CD. (Gov't Ex. T–4. (Chase Mem. Supp. of Opp'n to Pl.'s Mot. Summ. J. at 5 (Undisputed Fact Nos. 8 and 9)).)

The undisputed evidence compels a finding that Chase, motivated by a desire to protect its lucrative relationship with Lansdale, permitted him to continue to withdraw funds from the Marina Pacifica CD after receiving notice of the 1991 levy.[12] The author of Chase's May 8, 1989, senior officer approval memorandum ac-

knowledging Marina Pacifica's successor liability for the debts and obligations of the former LIV (Gov't Ex. O–4) also authorized the May, 1991, transfer of $724,695.02 from the CD to Lansdale's California bank account. (Gov't Ex. U–3.)

■ The aforementioned knowledge of Chase's senior officers is imputed to the bank as a whole.[13] It is undisputed that at the time of the 1991 levy Chase knew that LIV had merged into Marina Pacifica and that Marina Pacifica had assumed responsibility for all of LIV's liabilities, including any liens on its Chase CD. Chase also knew that the Marina Pacifica CD it held had been purchased entirely with LIV cash, which the notice of levy informed the bank was subject to the VIBIR lien. Since the notice of levy sufficiently advised Chase that it had custody of personal property which was subject to the levy, Chase was obliged to honor the levy and surrender the property. *See United States v. Donahue Indus.,* 905 F.2d 1325, 1332 (9th Cir.1990) (deficiency in notice of levy regarding taxpayer identity where bank has actual knowledge of identity does not provide reasonable basis for refusing to honor levy).

One of the significant factors compelling this conclusion is Chase's deep interest in retaining its relationship with the Lansdales and possession of the CD. Chase was not an innocent stakeholder of the CD. It

**12.** Although 33 V.I.C. § 1052 was derived from I.R.C. § 6332, it does not contain the "Special Rule for Banks" presently set forth in section 6332(c), which gives a bank 21 days to surrender deposits after being served with a notice of levy. The evidence and pleadings indicate, however, that Chase responded to the VIBIR notice of levy as if the 21 days of I.R.C. 6332 applied. It is abundantly clear to the Court that Chase aided Lansdale in avoiding the consequences of the levy by notifying him of it, which gave him the opportunity to request the transfer of funds on May 13, 1991, exactly 21 days after receiving notice of the

levy. (*See* Gov't Ex. U–2 (Lansdale request to transfer funds, dated May 13, 1991).)

**13.** *See, e.g., F.D.I.C. v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir.1992) ("Generally, courts impute a bank officer or director's knowledge to the bank unless the officer or director acts with an interest adverse to the bank."); *In re Carter,* 511 F.2d 1203, 1204 (9th Cir.1975) (bank generally chargeable with knowledge acquired by manager or officer of branch bank in course of duties).

retained a direct interest in it as collateral for its loan to Lansdale and acted to protect that self-interest and to continue its lucrative banking relationship with Lansdale.

> In each of the cases cited by the government, the party that was found to be responsible for not honoring the levy was not ... an innocent stakeholder .... Rather, in each of the cases cited by the government, the party whose actions were in question had some kind of interest in the funds.... The parties in these cases were attempting to take the funds of the taxpayer to satisfy the taxpayer's debts and obligations with the bank....

*United States v. First Interstate Bank of Idaho, N.A.,* 793 F.Supp. 934, 939–40 (D.C.Idaho 1992) (citing *Donahue Indus.,* 905 F.2d at 1325;) *see also United States v. Cache Valley Bank,* 866 F.2d 1242 (10th Cir.1989); *United States v. Bank of Celina,* 721 F.2d 163 (6th Cir.1983).

■ In short, when a bank served by the VIBIR with notice of tax levy is aware that a successor corporation took over the taxpayer's liens and obligations, has assisted the taxpayer in transferring to its successor the property which is subject to the tax lien underlying the levy, knows that the taxpayer and the successor corporation are controlled by the same person or persons, and is an interested stakeholder in that property, the custodian must honor the levy and surrender the property to the VIBIR. Chase had been advised by LIV's accountant in March of 1985, well before any merger into Marina Pacifica, that "the V.I. Bureau of Internal Revenue was billing [LIV] for tax payment deficiencies ...." (Gov't Ex. O–1 (Memo to file from Chase Vice President, Mar. 15, 1985).)

Chase's own interest in the CD, combined with its awareness that a tax lien in the name of LIV attached to and followed the Marina Pacifica CD, deprive Chase of any benefit of the doubt in this case. Chase cannot be heard to assert that it did not possess any property or property rights of LIV on April 22, 1991, when it was served with notice of the 1991 levy.

The Court will grant the VIBIR summary judgment on this claim. Chase therefore is liable for the value of the CD on April 22, 1991, $1,304,138.17, plus interest of six percent per year from that date and statutory costs.

### D. The Fifty–Percent Penalty

■ Chase is not liable to pay a fifty-percent penalty for failure to satisfy the 1991 levy because the applicable penalty section, 33 V.I.C. § 1052, does not provide for a fifty-percent penalty. Section 1052(b), entitled "Penalty for violation," states in relevant part:

> Any person who fails or refuses to surrender ... any property or rights to property, subject to levy, upon demand by the Director, shall be liable in his own person and estate to the government of the United States Virgin Islands in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of the taxes for the collection of which such levy has been made, together with costs and interest on such sum at the rate of 6 percent per annum from the date of such levy.

33 V.I.C. § 1052(b). Accordingly, there being no legal authority to impose a fifty-percent penalty in this case, the Court will grant Chase summary judgment on the penalty claim.[14]

---

14. Subsection 6332(d)(2) of the Internal Revenue Code, entitled "Penalty for Violation," which the VIBIR erroneously cites as authority for its claim to the fifty-percent penalty,

## E. The 1992 Levy

Chase defended its refusal to honor the notice of the 1992 levy naming LIV, Marina Pacifica and/or Lonesome Dove as the taxpayer, on the ground that "[t]he funds held by Defendant at the time of the tax levies were not the property of the Taxpayer." (Chase's Answer to Am. Compl. at 5.) This is one of two defenses available to a third party custodian under 33 V.I.C. § 1052(a),[15] namely, that the bank, in the words of section 1052(a), is neither "in possession of ([n]or obligated with respect) to property or rights to property" belonging to the delinquent taxpayer. *See* 33 V.I.C. § 1052(a); *see also National Bank of Commerce*, 472 U.S. at 721–22, 105 S.Ct. 2919 (citing *United States v. Sterling Nat'l Bank & Trust Co. of New York*, 494 F.2d 919, 921 (2d Cir.1974)) (holding only two defenses under federal statute, I.R.C. § 6332, which is comparable to 33 V.I.C. § 1052(a)).[16] Chase was thus required to prove both that it (1) was not in possession of any property or rights to property subject to the 1992 levy *and* (2) was not obligated with respect to any property or rights to the property of LIV/Marina Pacifica.

■ Since only the local penalty provision is involved, territorial or state law determines which property interests belonged to which entity, Marina Pacifica/Lonesome Dove or Chase. The Lansdale corporations and Chase agreed to be bound by New York law. Therefore, New York state law governs the determination of whether Lonesome Dove retained any property interest in the CD. The bank argues that, at the time it received notice of the 1992 levy, it was not "in possession of" property of the Lansdale corporations, because Chase had already restricted access to and setoff the funds in the CD against Lansdale's loan, and hence those funds were the property of the bank as a matter of New York state law.[17]

■ Unfortunately, Chase cannot distinguish and avoid the consequences of the proposition that a taxpayer without an unqualified right to withdraw funds nevertheless can retain a sufficient property interest to subject the funds to attachment by levy for his delinquent taxes. *See Congress Talcott*, 993 F.2d at 320 (*citing United States v. Marine Midland Bank*, 675 F.Supp. 775 (W.D.N.Y.1987) (interpreting

---

does provide "for a penalty equal to 50 percent of the amount recoverable." This penalty provision, however, has not been adopted by the Legislature.

15. This section provides that:
    Any person *in possession of (or obligated with respect to)* property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Director, surrender such property or rights (or discharge such obligation) to the Director except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.
    33 V.I.C. § 1052(a) (emphasis added).

16. The other defense, that the CDs were "subject to a prior judicial attachment or execution," has not been suggested by the parties.

17. Chase further asserts that it perfected its security interest in the original CD in March, 1986, when LIV assigned Chase, as collateral against the $1.2 million loan to Lansdale, a security interest in the CD. Chase relies on section 9–305 of the New York Uniform Commercial Code, which states "A security interest in ... instruments ... may be perfected by the secured party's taking possession of the collateral ...." In an action to enforce a levy, however, the Court is not concerned with lien priorities. *See Congress Talcott*, 993 F.2d at 319 n. 3; *see also National Bank of Commerce*, 472 U.S. at 721, 105 S.Ct. 2919 ("In contrast to the lien-foreclosure suit, the levy does not determine whether the Government's rights to the seized property are superior to those of other claimants.").

New York state law)). Under the defense that the levied property is not the taxpayer's property or rights to property, "even if others claim an interest in the property and the taxpayer's interest may be quantified as but a modicum, the property remains subject to attachment by levy and must be surrendered until ultimate ownership can be resolved." *Id.* at 319 (citations omitted).[18]

■ Chase has provided no authority supporting its assertion that the CD automatically became the bank's property as a matter of New York law simply by refusing to permit the Lansdale corporations to reduce the balance in the CD below the outstanding balance of his personal loan and without actually exercising any right of setoff it may have had. This Court similarly has found no such statutory or case authority. Accordingly, I reject the proposition that Chase's refusal to allow any of the Lansdale corporations to reduce the balance of the CD below the amount of Lansdale's personal loan for which it was collateral automatically extinguished the delinquent taxpayer's rights in the CD. As discussed below, Chase did not exercise its claimed right of offset until after it received the VIBIR's 1992 levy notice. The delinquent taxpayer therefore retained a property interest in its CD in the bank's possession when Chase received notice of the 1992 levy and Chase unreasonably refused to surrender the $606,167.51 represented in that CD. Chase cannot avail itself of the defense because it fails the first requirement, the "in possession of" element of the defense. The Court finds that Chase was in possession of a CD in which Lonesome Dove retained property rights under New York law.[19]

18. The decision Chase relies upon heavily is inapposite. *I.R.S. v. Gaster,* 42 F.3d 787 (3d Cir.1994) (reversing lower court ruling in favor of I.R.S. because withdrawal from bank account held by taxpayer husband and his wife as .tenants-by-the-entirety required the signatures of both spouses under state law and bank policy). Since *Gaster* was a wrongful levy action under I.R.C. § 7426, for which there is no comparable V.I.C. section, competing property interests were properly before the court. *See supra* note 17 and accompanying text. Moreover, the Supreme Court's *National Bank of Commerce,* on which *Gaster* relies, does not stand for the proposition that the lack of an unfettered, unilateral right to funds deprives a delinquent taxpayer of all property interests in a CD held by a bank as collateral. *See National Bank of Commerce,* 472 U.S. at 724, 105 S.Ct. 2919 (right to levy on accounts in joint names where taxpayer had absolute right under state law and contract with bank to compel payment of outstanding balances in accounts).

19. The proposition that a taxpayer's present lack of immediate access to the CD did not necessarily deprive him of a property interest in it was similarly recognized in a case governed by Pennsylvania law also involving a CD pledged as collateral and subsequently levied against to satisfy a federal tax lien.

Although an absolute right to withdraw funds from a bank sufficiently shows a right to property within the meaning of [language in I.R.C. § 6332 equivalent to 33 V.I.C. § 1052], this court concludes that it does not follow that an inability to make withdrawals is equally compelling to show a lack of any interest in the property sufficient to constitute the defense recognized in National Bank. Thus, the assertion by the defendant that the taxpayer in the present case lacked the ability to withdraw funds from the certificate of deposit because it was collateral for the letter of credit and other loans are not sufficient under *National Bank* to show that the taxpayer lacked any interest in the deposit.

*United States v. First Nat'l Bank & Trust Co.,* 695 F.Supp. 194, 196 (E.D.Pa.1988). The court was nevertheless required to rule for the bank because, under the peculiarities of Pennsylvania law, the taxpayers rights in the CD had been extinguished as a matter of law when the balance of the CD fell below the amount of the mature loan for which it was collateral security. *See id.* (characterized as "the right of automatic setoff under Pennsylvania law"). Chase does not prevail here in somewhat similar circumstances, however,

Chase's own words and actions after it was served with the levy support this conclusion. On May 27, 1992, exactly one week after receiving the notice of the 1992 levy, Chase sent a letter to its local counsel expressing its "desire to offset the deposit against the loan owed to Chase." (Gov't Ex. X–1.) Two days later, on May 29, 1992, Chase sent Lansdale a letter demanding payment of his personal loan. (Gov't Ex. X–5 (noting that Chase had "offset *your* certificate of deposit.") (emphasis added) That same day, Chase authorized the release of the CD as an offset against Lansdale's $600,000 loan. (Gov't Ex. X–3) (internal Chase memorandum, May 29, 1992).) On June 3, 1992, Chase's local counsel "concur[ed] . . . with [the] decision to setoff the deposit with Chase against the loan owed to Chase." (Gov't Ex. X–4.) Chase finally offset the funds on June 5, 1992. (Gov't Ex. X–5 (internal Chase memorandum of June 10, 1992); Chase Mem. Opp'n to Mot. Summ. J. at 10.)

It is apparent that at the time of the 1992 levy Lonesome Dove retained a chose in action in its CD and that this right to recover funds in that CD constituted a right to property under New York law and within the meaning of 33 V.I.C. § 1052(a). Such a chose in action that is contingent on repayment of a loan is considered a property interest for purposes of a tax levy. *See Congress Talcott,* 993 F.2d at 320–21 (future contingent interest is property interest for tax levy purposes). In this case, Chase attempted to extinguish Lonesome Dove's interest in the CD only *after* service of the 1992 levy. Since these contingent interests cannot now be valued, Chase is liable for the full value of the CD at the time of the 1992 levy, $606,167.51,

plus statutory costs and interest of six percent per annum.

The Court will grant summary judgment in favor of the VIBIR on this claim.

### III. CONCLUSION

With respect to both the 1991 and 1992 levies, the Court will grant the VIBIR's motion for summary judgment and deny Chase's motion for summary judgment. Since the liabilities arise out of levies upon the same property and property rights, Chase is liable only for the greater of the two levies, the 1991 levy, not the cumulative total. In addition, the fifty-percent penalty requested by the government is not provided for under Virgin Islands law. The Court will deny as moot Chase's motion to file an amended answer.

### ORDER

For the reasons set forth in the foregoing Memorandum, it is hereby

**ORDERED** that the VIBIR's motion for summary judgment is **DENIED** with respect to the fifty-percent penalty and **GRANTED** with respect to the 1991 and 1992 levies to the extent the Chase shall only once be liable for the same funds twice levied; it is further

**ORDERED** that Chase Manhattan Bank's motion for summary judgment is **GRANTED** with respect to the fifty-percent penalty and is **DENIED** with respect to the 1991 and 1992 levies; it is further

**ORDERED** that Chase Manhattan Bank's motion for leave to amend it answer is **DENIED** as moot.

---

for two reasons: (1) New York law has no provision granting a bank such a right of automatic setoff when a mature loan exceeds the amount of its collateral, and (2) Lansdale's personal loan never exceeded the amount of his corporation's CD held by Chase.